UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DARNELL E. WILLIAMS and YESSENIA M. TAVERAS, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) C.A. No. 16-11949-LTS<br>) |
| ELISABETH DEVOS, in her official capacity as Secretary of the U.S. Department of Education, and STEVE MNUCHIN, in his official capacity as Secretary of the U.S. Department of the Treasury,[1] | ) **Leave to File Granted**<br>) **on February 27, 2017**<br>)<br>) |
| Defendants. | )<br>) |

## **REPLY TO OPPOSITION TO MOTION TO DISMISS**

In Opposition to the motion to dismiss filed by Defendants Elisabeth DeVos and Steve Mnuchin,[2] Plaintiffs essentially argue two reasons that the Amended Complaint ("Complaint") should not be dismissed. First, Plaintiffs argue that they were not required to exhaust or even pursue their administrative remedies by asserting a "borrower defense" to the collection of their defaulted student loan debt before filing this action in Court. Second, they argue that, even if they were, a letter sent by the Massachusetts Attorney General to the Secretary of Education

---

[1] The action was originally brought against then-Secretary of Education John King and then-Secretary of the Treasury Jacob Lew, in their official capacities. Thereafter, Elisabeth DeVos was sworn in as the Secretary of Education on February 7, 2017 and Steven Mnuchin was sworn in as Secretary of the Treasury on February 17, 2017. As such, they are automatically substituted as the proper party defendants pursuant to Federal Rule of Civil Procedure 25(d), and it is respectfully requested that docket be amended to reflect the same.

[2] Defendants moved to dismiss all claims against them. (Documents No. 18 and 19). Plaintiffs responded by opposing the motion of Secretary DeVos (Document No. 22), and filing a "Notice of Voluntary Dismissal" as to the claims against Secretary Mnuchin. (Document No. 23). Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A), the claims against Secretary Mnuchin cannot be dismissed by notice where, as here, he has responded to the Complaint. Because Plaintiffs have not opposed Defendant Mnuchin's motion, however, it is respectfully requested that all claims against him be dismissed and he be terminated as a party to this action.

1

should suffice. Plaintiffs' remaining arguments go to the merits of their borrower defense claims, which are not before the Court on the motion to dismiss. For the following reasons, Plaintiffs' opposition is unavailing and the Court should grant Defendants' motion.

**ARGUMENT**

Plaintiffs defaulted on their student loans and ignored multiple notices sent by Education and Treasury with respect to their legal rights to challenge impending debt collection. (See generally Declarations of Jennifer L. Plant (Document 19-1) ("Plant Decl.") and Chad Keller (Document No. 19-2) ("Keller Decl.") and exhibits thereto). Now, they allege that Education's certification of their particular debts for offset – despite its investigation of misrepresentations made by *some* Corinthian schools involving *some* Corinthian students for *some* periods of time – violated the legal safeguards built into the Treasury Offset Program ("TOP") certification process.

Plaintiffs do not allege that they failed to receive notice or that they availed themselves of the process to submit evidence to the Secretary and she failed to consider it. Rather, Plaintiffs insist that – despite the statutory and regulatory structure – they are not required to participate in the administrative process created by law. Instead, Plaintiffs allege that Corinthian's misconduct for certain periods between 2010 and 2014 at over 100 campuses in 21 states (Compl. ¶¶ 38-49; Memorandum in Support of Motion to Dismiss ("Memorandum") at 4-6) renders their specific debts unenforceable. While this may in fact prove to be true, Plaintiffs are required to present evidence to Education for its consideration prior to seeking judicial review by this Court.

1. **Plaintiffs Were Required to Exhaust Their Administrative Remedies.**

The requirement that a party exhaust available administrative remedies ensures that the agency has the opportunity to bring its expertise to bear on an issue presented, and has an opportunity to correct any errors it may have made at an earlier stage in proceedings. See

McGee v. United States, 402 U.S. 479, 486 (1971). Moreover, it is well established that a party may *not* challenge an agency action on an issue that was never presented to the agency during administrative proceedings. See Sw. Pa. Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997). The First Circuit has explained the importance of a federal court plaintiff's adherence to exhaustion requirements as follows:

> It may seem hypertechnical to some that a person who believes herself aggrieved by agency action must jump through a series of hoops before she can seek out a judicial forum. But long-recognized concerns regarding agency autonomy and judicial efficiency weigh heavily in favor of requiring complete exhaustion of administrative remedies. When all is said and done, our system of justice depends on litigants' adherence to well-defined rules. Where, as here, a party decides unilaterally to forsake those rules, she does so at her peril. . . . The short of it is that [the plaintiff] lacked a legally sufficient reason for leaping prematurely to a judicial venue. Thus, the district court should have dismissed her complaint for failure to exhaust available administrative remedies.

Portela-Gonzalez v. Sec'y of the Navy, 109 F.3d 74, 80 (1st Cir. 1997).

Here, Plaintiffs argue, citing Darby v. Cisneros, 509 U.S. 137, 144 (1993) (Opp'n at 12-13), that the Administrative Procedure Act ("APA") does not require exhaustion in these circumstances. Plaintiffs are correct that exhaustion is not *always* required under the APA, Darby, 509 U.S. at 144, however, where, as here, there is a statutory procedure in place for challenging the collection of a federal debt through the TOP, Plaintiffs were required to explore that process before filing this action. See Ogunmokun v. Am. Educ. Servs./PHEAA, Civil Action No. 12-4403 RRM JO, 2014 WL 4724707 at *4 (E.D.N.Y. Sept. 23, 2014) (exhaustion required for identity theft discharge claim under the Higher Education Act and implementing regulations); see also Tavares v. United States, Civil Action No. 13-1654, 2014 WL 4351532 at *6 (M.D. Pa. Sept. 2, 2014) (requiring exhaustion of a debtor's challenge to an agency's referral to TOP); U.S. v. Beulke, 892 F. Supp. 2d 1176, 1187 (D.S.D. 2012) ("if the [federal agency] had referred [the debtor] to the TOP, he must exhaust administrative remedies before seeking redress

3

in court"); U.S. v. Mayer, 04-CR-100-1-SM, 2010 WL 4916561 at *1 (D.N.H. Dec. 3, 2010) (challenge to DOJ's referral of a criminal restitution judgment to TOP must be administratively exhausted before seeking judicial review); U.S. v. Harrison, CRIM 394-CR-428-D, 2007 WL 2332662 at *2 (N.D. Tex. Aug. 16, 2007) (debtor could not challenge the amount of his debt or whether it was legally enforceable in court without first making those arguments to the creditor agency).

Plaintiffs describe in detail the process available to them at the administrative level to challenge the collection of their debt through TOP (see Opp'n at 4-5), and Defendants will not repeat it here. As set forth in Defendants' Memorandum at pages 3-11 and recounted by the Plaintiffs in their Opposition, the process is a combined function of Section 455 of the Higher Education Act ("HEA"), 20 U.S.C. § 1087e(h); the Debt Collection Improvement Act ("DCIA"), 31 U.S.C. § 3701, *et seq.*; and the implementing regulations established by the Departments of Education and Treasury. See, e.g., 34 C.F.R. § 685.206; 31 C.F.R. § 285.5; 34 C.F.R. §§ 30.22, 30.24.[3] The process is multi-layered, giving debtors numerous opportunities to challenge the

---

[3] The due process requirements of the DCIA exist to provide debtors with an opportunity to prove on the front end that the debt that the government intends to collect through offset is not legally enforceable. In re Huff, 343 B.R. 136, 144 (W.D. Pa. 2006) ("The TOP ensures that the debtor be given an opportunity, at the outset, to contest the validity of the past-due legally enforceable debt."). Specifically, any federal agency that is owed by a person a past-due, legally enforceable debt may refer the debt for collection through TOP only after it: "(1) notifies the person incurring such debt that such agency proposes to take action pursuant to such paragraph with respect to such debt; (2) gives such person at least 60 days to present evidence that all or part of such debt is not past-due or not legally enforceable; (3) considers any evidence presented by such person and determines that an amount of such debt is past due and legally enforceable; (4) satisfies such other conditions as the Secretary may prescribe to ensure that the determination made under paragraph (3) with respect to such debt is valid and that the agency has made reasonable efforts (determined on a government-wide basis) to obtain payment of such debt; and (5) certifies that reasonable efforts have been made by the agency (pursuant to regulations) to obtain payment of such debt." 31 USC § 3720A(b). The term "legally enforceable" is defined in section 285.5(b), governing the centralized administrative offset program. The definition provides, most significantly, that "there are no legal bars to collection by offset." 31 C.F.R. § 285.5(b); see also Kipple v. United States, 105 Fed. Cl. 651, 656 (2012) ("The relevant regulations focus on the agency's inquiry on whether some *legal bar* such as an automatic stay in a bankruptcy proceeding precludes collection.").

collection of their debt through TOP – both *before* the debt is certified by the creditor agency (see 31 U.S.C. §§ 3716(a); 3720A(b); 31 C.F.R. § 285.5(d)(6)(ii)), and *after*. In fact, Education allows debtors to challenge certification at *any time*, even after the time period in 31 U.S.C. § 3720A(b)(2) has expired. (See Notice of Offset, Attachment 8 to Keller Decl.) ("You may obtain documents, a review, or a hearing…even if you miss the deadlines in this notice. However, if [Education] has already requested Treasury to offset your Federal and/or State tax refunds and other payments, [Education] will not withdraw the request until you prove that the debt was not legally enforceable or not past-due.")

When considering whether a similar administrative process is something that prospective litigants were *required* to exhaust before coming to Court, the Court in Ogunmokun concluded that the answer was *yes*: a borrower seeking to discharge his student loan debt must avail himself of administrative remedies before seeking judicial review. Id. Specifically, the Eastern District of New York found:

> Under the [HEA], which governs student loans guaranteed federally by [Education], a borrower seeking certain types of loan relief must normally avail himself of the administrative process outlined in 34 C.F.R. § 682.402. The HEA does not permit a private right of action for student borrowers of such loans. As relevant here, a borrower seeking discharge of a student loan debt on the ground of identity theft must follow the procedure set forth in 34 C.F.R. § 682.402(e). The borrower must begin by submitting a written request and sworn statement to the holder of the promissory note certifying information concerning the identity theft. The borrower must also provide a copy of a verdict or judgment establishing that the borrower was, in fact, the victim of an identity-theft crime. The request and attendant materials are forwarded to the federally-backed guaranty agency—in this case, PHEAA—which determines whether the borrower qualifies for a discharge of the loan. If the guarantor denies the request for discharge, a borrower may appeal directly to the Secretary of Education. See 34 C.F.R. § 682.402(e)(7)(iii)(B)(2). ***If dissatisfied with the decision of the Secretary of Education, only then would the borrower be entitled to file a claim for judicial review under the Administrative Procedure Act.*** See 5 U.S.C. §§ 701, *et seq*.

5

Ogunmokun, 2014 WL 4724707 at *5 (E.D.N.Y. Sept. 23, 2014) (some citations omitted) (emphasis added). The statutory and regulatory scheme set up for borrowers to challenge certification and collection of their student loan debt through TOP deserves the same deference. See Bowers v. Penn. Higher Educ. Assistance Agency, Civil Action No. 10–8675 (PKC), 2011 WL 3585986 at *5–6 (S.D.N.Y. July 29, 2011) (dismissing claims for failure to exhaust administrative remedies where debtor did not request a hearing under 34 C.F.R. § 682.410(b) to challenge collection of an defaulted FFELP loan through TOP); Sims v. Apfel, 530 U.S. 103, 108 (2000) (courts should respect agency regulations requiring issue exhaustion in administrative appeals by declining to consider unexhausted issues).

    **2. Even if Exhaustion Is Not Mandatory, the Court Should Require Plaintiffs to Exhaust Their Remedies Before Seeking Judicial Review in These Circumstances.**

Exhaustion serves a crucial function, particularly in massive government programs involving the specific subject matter expertise of a particular government agency, such as Education. For instance, federal courts have found that requiring plaintiffs to exhaust their administrative remedies before obtaining judicial review of administrative action furthers many important legislative and judicial policies, including:

    (1) avoiding premature interruption of the administrative process;

    (2) permitting the agency to develop the necessary factual background upon which decisions should be based;

    (3) permitting the agency to exercise its discretion or apply its expertise;

    (4) improving the efficiency of the administrative process by preventing repeated judicial interruption;

    (5) conserving scarce judicial resources, since the courts will not have to intervene if the complaining party is successful in vindicating its rights in the administrative process;

    (6) giving the agency a chance to discover and correct its own errors; and

    (7) avoiding the possibility that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging evasion of its procedures.

See, e.g., FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 244 (1980) (purposes of finality and exhaustion requirements are to ensure the compilation of a complete agency record for judicial review or, alternatively, to obviate any need for judicial review); McKart v. U. S., 395 U.S. 185, 193-94 (1969) (purposes of requiring administrative exhaustion include avoiding the premature interruption of the administrative process, letting the agency develop the necessary factual record, giving the agency the first chance to exercise its discretion and/or to apply its subject matter expertise and promoting efficiency rather than permitting the parties to seek aid from the courts at various intermediate stages).[4] Here, there is no question that requiring student loan debtors to present a borrower defense claim to Education before filing a federal civil action in court furthers *all* of these important policies and interests.

First, requiring exhaustion promotes administrative efficiency by preventing premature interference with the agencies' processes. As set forth above, the HEA and DCIA, along with

---

[4] See also Human Genome Scis., Inc. v. Genentech, Inc., 589 F. Supp. 2d 512, 519–20 (D. Del. 2008) (exhaustion "promotes administrative efficiency by preventing premature interference with the agency processes, (2) respects executive autonomy by allowing an agency the opportunity to correct its own errors, (3) facilitates judicial review by affording courts the benefit of the agency's experience and expertise, and (4) serves judicial economy by having the agency or other tribunal rather than the district court, compile a factual record.... [R]equiring exhaustion also exemplifies deference within the constitutional framework to Congress's decision as to the proper forum for the initial resolution of disputes under its statutes") (citations omitted), *dismissed*, 368 Fed. Appx. 116 (Fed. Cir. 2009); Cerro Metal Products v. Marshall, 620 F.2d 964, 970–71 (3rd. Cir. 1980) (same); U.S. Postal Service v. Notestine, 857 F.2d 989 (5th Cir. 1988) (purposes of exhaustion are "(1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that 'frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures'") (citations omitted); Peter Kiewit Sons Co. v. U.S. Army Corps of Engineers, 714 F.2d 163 (D.C. Cir. 1983) (exhaustion necessary because initial agency determination required discretion and expertise of administrator); St. Regis Paper Co. v. Marshall, 591 F.2d 612, 613-14 (10th Cir. 1979) (exhaustion affords administrative agencies an opportunity to correct their own errors prior to judicial intervention, thus mooting many issues before they reach the courts; serves to maximize efficient administrative process by preventing repeated judicial interruption; and promotes "administrative autonomy" and an interest in preserving the effectiveness of agency operations, which could be threatened by "frequent and deliberate flouting of administrative processes.").

7

Education and Treasury regulations, create a specific process under which individuals may raise defenses to the enforceability of a debt to the creditor agency. See, e.g., 31 U.S.C. §§ 3716(a), 3720A(b); 31 C.F.R. § 285.5(d)(6)(ii). In addition to the long-standing process in place for Education to resolve objections to Treasury offset, since 2015, Education has invested significant time and resources to create a specific process by which it can comprehensively and efficiently evaluate borrower defense claims brought by borrowers, and especially borrowers who attended Corinthian schools. (See Memo. at 4-6). After having received only a few borrower defense claims in over 20 years, Education has now received more than 82,000 claims in two years. (Id. at 6). In response to this influx of claims, which are fact-dependent, Education built an entirely new process and hired a team of specialists to resolve them.[5] As of October 12, 2016, Education had approved 15,694 claims. See Borrower Defense Report (October 26, 2016).[6]

Moreover, the approval of 15,694 claims demonstrates another benefit of exhaustion: requiring plaintiff to pursue the administrative process allows the agency the chance to consider whether it has made a mistake and correct any errors. By Plaintiffs' prematurely filing this lawsuit before Education has received a claim from Williams or issued its decision on Taveras's claim, Education has not had that opportunity. Instead, Plaintiffs ask this Court to consider their borrower defense claim before the agency specifically tasked with such determination has had the opportunity to do so.

---

[5] Starting with the hiring of a special master, and continuing through the hiring of new staff and a new director, Education has increased its capacity to handle claims precisely like those raised by Plaintiffs. See Fourth Report of the Special Master for Borrower Defense to the Undersecretary (June 29, 2016) *available a*t http://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-4.pdf (last visited March 28, 2017). The court should permit Education to use the expertise to evaluate the information it has obtained about these schools to make a determination on their claims. See, *supra*, note 4.

[6] *Available at* https://www2.ed.gov/documents/press-releases/borrower-defense-report.pdf (last visited March 27, 2017).

8

Critically, requiring student loan debtor plaintiffs to participate in the administrative process and allowing Education an opportunity to first decide their claims would facilitate judicial review, if it were ultimately necessary, by affording the court the benefit of the agency's experience and expertise. As Plaintiffs have noted, Education has received information about Everest's practices from a variety of sources. (See, e.g., Opp'n at 7). Indeed, Education conducted an extensive investigation and made specific findings regarding Corinthian's wrongdoing. (See Memo. at 5-6). In addition to longstanding resources devoted to the review and determination of objections to offset, since Corinthian's conduct has been discovered, Education has created an entire organizational unit comprised of attorneys and other personnel who work exclusively on the review and resolution of borrower defense.[7] It would thus be both inefficient and a waste of these resources for the Court to allow Plaintiffs to bypass the prescribed agency review process.

Finally, exhaustion clearly serves judicial economy by limiting the need for judicial review at all. As stated, more than 82,000 Corinthian students have submitted borrower defense claims.[8] Had they not been required to exhaust their claims, this could have resulted in the filing of 82,000 lawsuits in federal courts across the country, with more to come. Instead, Education continues to work to resolve these claims administratively without the need for any judicial involvement at all. In short, having the claims be first presented to and decided by the agency with the specific expertise and resources to review and decide the claims clearly serves the interests of the agency, the borrowers and the Court.

Requiring Plaintiffs to exhaust their remedies will not result in any prejudice to them. First, requiring Plaintiffs to pursue their administrative remedies will not cause undue prejudice

---

[7] See Borrower Defense Report, *supra* at note 6, at page 1.

[8] See Borrower Defense Report, *supra* at note 6, at page 2.

to their subsequent assertion of a court action, such as from an unreasonable or indefinite timeframe for administrative action. Plaintiffs mistakenly allege that the only process available to them is to request a discretionary hearing, to which they assert they are not entitled. (See Opp'n at 13). Rather, at this juncture, Plaintiffs have two avenues to contest the enforceability of their debts: (1) request an untimely hearing;[9] or (2) submit a borrower defense claim directly to Education,[10] as plaintiff Taveras has already done. (See Keller Decl. ¶ 20).

Second, Plaintiffs further allege, based on declarations from two declarants who are not parties to this action, that the administrative process takes an unreasonable amount of time. In their Complaint, Plaintiffs allege mistreatment by Everest before and while they were enrolled, generally in 2010 and 2011. Although Plaintiff Williams's loan has been in default since November 2014 (Keller Decl. ¶ 10), Plaintiff Williams has never –outside of this action – informed Education that he believes that he has a defense to repayment of his loans based on Corinthian's conduct in 2010-2011. Moreover, although Taveras's loan has been in default since September 2014 (Keller Decl. ¶ 17), she did not object to certification until *after* Education obtained an offset in 2016. (Id. ¶¶ 19-20). Once she did, collections ceased before any additional offset occurred.[11] While both Plaintiffs ignored notice after notice from Education and Treasury (see generally Memo. at 11-12 and Plant and Keller Declarations) – and exhibited no urgency in obtaining discharge of their loans despite the fact that they claim they were

---

[9] Education's TOP notice commits Education to providing a borrower with a hearing, even if he or she misses the 65-day deadline. (See Keller Decl. Attachment 8).

[10] Similarly, a borrower may submit a borrower defense claim online or by mail to Education *at any time* and request that collection activity be stopped (as Taveras has done, successfully).

[11] She argues that the four months that elapsed between her claim and the agency's action was unreasonable (see Opp'n at 14), however, there is no proof and nor does she claim that she was subject to any further offset in the interim.

mistreated as far back as 2010– they now allege that Education's administrative process will take an unreasonable amount of time. Plaintiffs cannot sit on their rights, delay the commencement of a prescribed administrative process and then claim that said process will take too long. See, e.g., Ogunmokun, 2014 WL 4724707 at *5 (finding that because a borrower waited for five years after he was allegedly defrauded to file a lawsuit the matter was hardly time-sensitive and did not implicate imminent and irreparable harm).

Finally, Plaintiffs' argument that the filing of a borrower defense claim would be futile lacks merit. Plaintiffs seek to be removed from certification for offset. Education is empowered to remove them from certification while it reviews the validity of their objection to offset. (Keller Decl. ¶ 20). Thereafter, Education is empowered by section 455 of the HEA and 34 C.F.R. § 685.206(c) to cease collection of their debts and refund amounts it has collected if it determines that their claims have merit. While Plaintiffs argue that this process is futile, Taveras herself filed a borrower defense claim in June 2016 and her debt has been removed from certification pending a determination on her claim. (Keller Decl. ¶ 20). Nor is there any colorable claim that the agency is biased or has predetermined the issue before it. Education's grant of over 15,000 claims shows that Education is not biased against student claims. In its public statements, including the Notice of Proposed Rulemaking[12] and Final Rule,[13] Education has reiterated its commitment to providing relief to borrowers, as demonstrated by its investments in people and process. In short, arguing futility on these facts is disingenuous.

The law is clear that intervention by the courts preceding the exhaustion of available administrative remedies should be exercised only under circumstances where the facts clearly establish that fundamental rights and interests of a private party are being harmed and cannot be

---

[12] See 81 Fed. Reg. 39,329 (June 16, 2016).

[13] See, *supra,* note 6.

11

adequately redressed by permitting the administrative process to run its course. McGee, 402 U.S. at 479; McKart, 395 U.S. at 194-95. As Plaintiffs have made no such showing here, the Court must dismiss this action and the Plaintiffs must pursue their administrative remedies before returning to Court, if necessary.

### 3. Education Was Not Required to Consider the Letter from the Massachusetts Attorney General to be a "Borrower Defense Claim" By the Plaintiffs.

On November 15, 2015, the Massachusetts Attorney General ("Massachusetts AG") submitted a letter that she termed a "defense to repayment" application to Education seeking discharge of all federal loans obtained by student borrowers who attended Everest Institute campuses in Brighton and Chelsea, Massachusetts between 2007 and 2015. According to the Plaintiffs, the attachments to the Massachusetts AG's letter included her investigatory findings, supporting evidence, and attestations of former Corinthian students. (Opp'n at 9) (citing https://perma.cc/47TQ-58AQ). Plaintiffs do not allege that the Massachusetts AG's submission contained any specific information about them or the violations of state law that they claim Everest committed with respect to them. (See generally Opp'n).

At the time of the submission, Education did not recognize or have a process in place to accept or review group discharge applications, and it was not – and is not – legally required to do so. Since receiving the letter, however, Education conducted outreach to Everest students to inform them of the process to assert a borrower defense claim, including a postal mail campaign to over 280,000 Everest and WyoTech borrowers who enrolled between 2010 and 2014. See Borrower Defense Report (October 26, 2016).[14]

As explained in detail above and in Defendants' Memorandum, 34 C.F.R. § 685.206(c) presumes that a borrower would raise a defense to repayment *at the time* that Education seeks to collect a defaulted loan through TOP. Plaintiffs do not deny that they received due process in the

---

[14] See, *supra*, note 6.

way of notice and an opportunity to respond. (See generally Opp'n). As contemplated by the applicable regulation, the ideal time for Plaintiffs to raise a defense to repayment was when they received notice and were invited to provide evidence and/or request a hearing. Instead, neither responded to the notice. Education, however, goes beyond the minimum due process requirements of the DCIA before certifying a debt for TOP. Specifically, with the notice of intent to collect through TOP, Education sends each borrower a "Request for Review" form on which he or she can make an objection. (See, e.g., Document No. 19-2 at 109-110). Plaintiffs did not return their forms to Education. (See Keller Decl. ¶¶ 10-13; 17).

In short, the statutory and regulatory process through which Education initiates collection activities ensures that borrowers receive the requisite due process and provides debtors with the ability to present evidence of their claim so that Education can make a determination as to its validity. See 34 C.F.R. § 685.206; (see also Attachment 21 to Keller Decl.). While Education seeks to provide relief to borrowers injured by third parties, Education also has a responsibility to protect the interests of taxpayers. To further that interest, Education has conducted an individualized determination of each Corinthian borrower's eligibility for borrower defense. Id. A decision on a borrower defense claim requires the decision maker to measure the weight of evidence presented to the agency, including attestations, testimony, documents, and physical evidence. 81 Fed. Reg. 39,337 (June 23, 2016). Plaintiffs appear to believe that Education has a duty to know whether Plaintiffs relied on representations made by the school and whether they relied on those representations to their detriment. (See, e.g., Complaint ¶¶ 80, 86). Plaintiffs do not claim, however, that any of this information was included in the Massachusetts AG's letter.

In order to expedite the granting of relief to borrowers, based on information compiled from various sources, Education determined that its Everest and WyoTech findings qualified students who first enrolled in the covered programs and time periods to apply for a discharge of

their Direct Loans through an expedited process using a simple attestation form. While Education created an online form to facilitate borrower submission of borrower defense claims, it did not unilaterally discharge any student's debt without receiving some form of attestation from the student about the conduct of Everest. At least 82,000 Corinthian students have since submitted borrower defense claims and are seeking relief through the administrative process.[15]

Both Plaintiffs erroneously allege that their loans are covered by Education's findings of job placement rate misrepresentation. Plaintiffs apparently misunderstand Education's findings. Williams alleges that he attended Everest Chelsea's massage therapy program from March 29, 2011 through December 28, 2011. (See Affidavit of Darnell Williams (Document No. 22-3, ¶ 3)). Education's published findings for that program cover students whose *first date of enrollment* fell between July 1, 2011 and September 30, 2014. See List of Everest Programs and Enrollment Dates[16] at 22. Thus, Williams's first date of enrollment – March 29, 2011 – does not fall within the presumptively eligible dates of enrollment. Likewise, Taveras alleges that she attended Everest Chelsea's medical assistant program from October 28, 2010 through July 14, 2011, (See Affidavit of Yessenia Taveras (Document No. 22-2, ¶ 3)), and Education's findings cover students whose first date of enrollment began between July 1, 2011 and September 30, 2014. See List of Everest Programs and Enrollment Dates[17] at 22. Taveras's first date of enrollment – October 28, 2010 – also does not fall within the dates of presumptive eligibility. In short, neither of the Plaintiffs is covered by Education's findings as to borrowers that are qualified for discharge. And even if they were, they would still be required to file an individualized claim form. See, *infra,* pages 12-13.

---

[15] See Borrower Defense Report, *supra* at note 6, at page 2.

[16] *Available at* https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf (last visited March 27, 2017).

[17] See, *supra,* note 16.

### 4. This Court Cannot Award Money Damages or Grant Injunctive Relief.

As set forth in Defendants' Memorandum, to the extent Plaintiffs seek to enjoin Education from collection of the debts owed to it by Plaintiffs and other Corinthian students through TOP, the Court lacks jurisdiction to issue such an injunction. While the HEA provides a limited waiver of Education's sovereign immunity from suit for some purposes, 20 U.S.C. § 1082(a)(2), the HEA expressly states that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary.…" Id. (emphasis added). Accordingly, federal courts lack the jurisdiction to issue an "injunction (or other similar process), under § 1082(a)(2) where the Secretary is colorably acting within [her] enumerated powers." OneSimpleLoan v. U.S. Secretary of Educ., Civil Action No. 06-2979, 2006 WL 1596768 at *5 (S.D.N.Y. June 9, 2006) (quoting Gross v. Bell Sav. Bank PaSA, 974 F.2d 403, 408 (3d Cir. 1992) (internal quotations omitted); Lipczenko v. Duncan, 2010 WL 672846 at *1 (D. Md. Feb. 22, 2010) (collecting cases); see also Green v. U.S., 163 F.Supp.2d 593, 597 (W.D.N.C. 2000) (Education is immune from suits for injunctive relief). While Plaintiffs may disagree with the Secretary's decision to certify their debts for offset, the power to certify is clearly within the Secretary's enumerated powers. See Shabtai v. U.S. Dep't of Educ., Civil Action No. 02-8437 LAP, 2003 WL 21983025 at *6–7 (S.D.N.Y. Aug. 20, 2003) (dismissing claims against Education and noting that the Secretary did not act outside her authority in referring the debt to Treasury for a tax refund offset and, as such, there was no claim for injunctive relief under the APA) (citing 26 U.S.C. § 6204(d)).

Moreover, Plaintiffs have brought their claims pursuant to the APA (Compl. ¶ 1), which specifically grants a right of action to "aggrieved" plaintiffs "seeking relief other than money damages." 5 U.S.C. § 702. In other words, by the APA, the United States has not consented to

15

suits for money damages.  Id.  This applies to constitutional[18] as well as statutory claims brought under the APA.  See Trudeau v. FTC, 456 F.3d 178, 186-87 (D.C. Cir. 2006).

### 5. Taveras's Borrower Defense Claim Is Pending and, As Such, Her Lawsuit Is Not Ripe.

The parties agree that Taveras did file a borrower defense claim, which is pending before the agency.  (Memo. at 12-13; Opp'n at 14).  It is well-settled that a case is not ripe if the administrative record is not yet complete because of pending agency review.  Marcum v. Salazar, 694 F.3d 123, 129 (D.C. Cir. 2012) (administrative appeal still pending at the time of the district court litigation); Bellsouth Corp. v. FCC, 17 F.3d 1487, 1489 (D.C. Cir. 1994) ("[A] party that stays before an agency to seek reconsideration of an order cannot at the same time appear before a court to seek review of that same order…").

Plaintiffs state that "[r]ipeness requires 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality' to warrant declaratory judgment." (Opp'n at 14).  They present two reasons why Taveras's claim is ripe: (1) her claims are fit for judicial review because she has already faced concrete consequences of offset; and (2) Education has harmed Taveras and the harm continues.  (Opp'n at 15).  Neither of these reasons are availing.

In their Complaint, Plaintiffs sought a declaratory judgment stating that their debts are not certifiable for offset and a refund of amounts already obtained by Education through offset. (Document No. 5 at 16-17).  Since offset occurred, Education has received a borrower defense claim from Taveras, has removed her debt from TOP, and has presented evidence that her account is "inactive" in TOP.  (Keller Decl. ¶ 20).  Additionally, Taveras has received a refund of the amount that was collected by offset.  (Plant Decl. ¶ 8(i)).  As a result, Taveras has obtained

---

[18] As previously noted, Plaintiffs have not raised any due process or other constitutional claims.

16

the interim relief she sought – *i.e.*, no harm is occurring and any alleged past harm has been rectified[19] – and once her claim is reviewed, Education will issue a decision on her claim, which may then be reviewable under the APA, if necessary.

### 6. **Plaintiffs Are Not Entitled to Discovery In this APA Action.**

Plaintiffs argue that the Court cannot decide this case without the benefit of discovery. (Opp'n at 19-20 and n. 10). In their Complaint, Plaintiffs cite the DCIA, the APA and the Declaratory Judgment Act ("DJA"). Although Plaintiffs cite to the DCIA in their Complaint, the DCIA does not waive the sovereign immunity of the United States or otherwise authorize suit by private person against it. See, e.g., Baker v. U.S., 642 F. App'x 989, 992 (Fed. Cir. 2016) (citing McNeil v. U.S., 78 Fed. Cl. 211, 228 (2007), *aff'd*, 293 Fed. App'x. 758 (Fed. Cir. 2008)); Hill v. Colvin, Civil Action No. 14-354, 2016 WL 727177 at *8 (M.D.N.C. Feb. 23, 2016) (DCIA does not waive sovereign immunity for monetary damages) (citing Miller v. Smith, 952 F. Supp. 2d 275, 283 (D.D.C. 2013) (same)). Moreover, the DJA does not confer jurisdiction, but rather, merely expands the potential remedies available to the Plaintiffs should they prevail on their claims. 28 U.S.C. § 2201; Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950).

---

[19] In this regard, Taveras's claim is both not ripe (because her administrative process is pending) and also *moot*, because she has received the relief she seeks. Article III of the Constitution limits the judicial power of the United States to the resolution of "cases" or "controversies." U.S. Const. art. III, § 2. Specifically, the Constitution requires that an actual controversy must exist at all stages of review, not merely at the time the complaint is filed. Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974). Once a case or controversy is moot, a federal court no longer retains jurisdiction to adjudicate the merits of the case. U.S. Const. art. III, § 2; see also U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 21-22 (1994); Ashcroft v. Mattis, 431 U.S. 171, 172-3 (1977) (an action that has become moot fails to present a justiciable case or controversy within the meaning of Article III); Overseas Military Sales Corp., Ltd v. Giralt-Armada, 503 F.3d 12, 17 (1st Cir. 2007) (under mootness doctrine, when issues presented are no longer live, or when parties lack a cognizable interest in the outcome, dismissal of the case is compulsory). Thus, the question of mootness is a federal one, which a federal court must resolve before it assumes jurisdiction. DeFunis v. Odegaard, 416 U.S. 312, 316 (1974). Here, Taveras requested that the offset of her tax refund be reversed (it was) and that her debt be pulled from TOP (it has been, pending final determination of her claim). Accordingly, her claim is moot and this Court lacks jurisdiction. See U.S. Const. art. III; See also U.S. Bancorp. Mortgage Co., 513 U.S. at 21-22 (since a case or action is moot, a federal court no longer retains jurisdiction to adjudicate the merits of a case).

In short, this is an action under the APA and, should the Court deny this motion to dismiss, its sole task is to decide whether Education acted arbitrarily, capriciously or contrary to law based on the record before it at the time of its action. See 5 U.S.C. § 706. As such, Plaintiffs are not entitled to discovery. Olsen v. United States, 414 F.3d 144, 155 (1st Cir. 2005).[20]

## CONCLUSION

For the foregoing reasons and the reasons included Defendants' Memorandum of Law in Support of Motion to Dismiss and the Declarations and exhibits filed therewith, it is respectfully requested that the Court dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) because it lacks jurisdiction over Plaintiffs' Amended Complaint.

Respectfully submitted,

WILLIAM D. WEINREB,
Acting United States Attorney

By: /s/ Jessica P. Driscoll
Jessica P. Driscoll, BBO No. 655394
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3398

Dated: March 31, 2017        Jessica.Driscoll@usdoj.gov

---

[20] The First Circuit has identified limited circumstances, not applicable here, in which APA litigants may be entitled to discovery: "the district court 'may' (although it is not required to) supplement the record where there is 'a strong showing of bad faith or improper behavior' by agency decision makers." Olsen, 414 F.3d at 155 (internal citations omitted).

**CERTIFICATE OF SERVICE**

      I, Jessica P. Driscoll, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants by First Class Mail.

                                                    */s/ Jessica P. Driscoll*
                                                    Jessica P. Driscoll
Dated: March 31, 2017                         Assistant United States Attorney