UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

DARNELL E. WILLIAMS, et al.,                 :

      Plaintiffs,                          :    Civil Action No.
                                   1:16-cv-11949-LTS
    v.                                       :

ELISABETH DEVOS, in her official             :
capacity as United States Secretary
of Education, et al.,                        :

      Defendants.                          :

- - - - - - - - - - - - - - - - - - x


    BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


MOTION HEARING



Friday, July 27, 2018
9:58 a.m.



John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts




Rachel M. Lopez, CRR
Official Court Reporter
One Courthouse Way, Suite 5209
Boston, Massachusetts  02210
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

    LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
    BY:  EILEEN M. CONNOR AND TOBY MERRILL
    122 Boylston Street
    Jamaica Plain, Massachusetts  02130
    (617) 390-2528
    econnor@law.harvard.edu


On behalf of the Defendant DeVos:

    UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
    BY:  JESSICA P. DRISCOLL
    John Joseph Moakley Courthouse
    One Courthouse Way, Suite 9200
    Boston, Massachusetts  02210
    (617) 748-3398
    jessica.driscoll@usdoj.gov

# P R O C E E D I N G S

(In open court.)

THE DEPUTY CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.

Today is July 27th, the case of Williams vs. Devos, civil action 16-11949, will now appear before this Court.

Counsel, please identify themselves for the record.

MS. CONNOR:  Your Honor, on behalf of the plaintiffs, this is Eileen Connor of the Legal Services Center of Harvard Law School.  And with me at counsel table I have Toby Merrill, also of the Legal Services Center.

THE COURT:  All right.  Welcome.

MS. DRISCOLL:  Good morning, Your Honor, Jessica Driscoll for the defendant, Secretary of Education, Elisabeth Devos.

THE COURT:  Good morning.  24 hours until vacation, right?

Give me one moment.  There are a lot of papers here.

Just one minor procedural -- with respect to what you filed -- two things.  One, with respect to Exhibit 3, it's not my intention to unredact that or anything.  I just want to look through all of them to get a sense of what they look like, so I don't see a reason why they won't -- well,

unless someone makes a motion and I had a good reason, I would assume it just be sealed where it is. And you had given me one, but I just wanted to look in the Kelleher declaration, I think; but I just wanted to look at all of them just to see.

And then you filed a supplemental memo yesterday. So I guess my question with respect to that is, before we get into further briefing on other issues, since there is already a lot of briefing, when would that be -- is that relevant now, or is that something that becomes relevant depending on how things are decided?

MS. DRISCOLL: Your Honor, I discovered it in following up on the post-briefing letter that the plaintiffs filed regarding *Darby* and the exhaustion issue. And in the last year and a half, it's troubled me very much that with these two massive programs, both the student loan program, through the Department of Education, and the TOPs program through Treasury, there is so few cases under the APA challenging student loan debts.

THE COURT: I would have thought your client would have been happy about that.

MS. DRISCOLL: But I figured how -- there must be more --

THE COURT: Litigation.

MS. DRISCOLL: -- aggrieved borrowers, and where

are these cases being filed.  So when I came across it

yesterday, it struck me as important to raise with the Court,

because I do think it's a matter of subject-matter

jurisdiction, because the APA only confers jurisdiction over

reviewable action, where there is no other adequate remedy in

the court.  And here we would argue there clearly is.

THE COURT:  So is your view that then every --

let's make it simple.  There's a borrower, they get a loan, a

student loan.  Arguably there's a good-faith basis for DOE to

think that the loan is past due, and DOE sends them the

notice.  All right.  And the person either, (a), doesn't

respond, or if they do respond, DOE considers whatever the

response is and deems it not good enough.  So it decides

that -- it looked at it, and it decides it is going to

proceed.  Either way, under (a), nothing, it certifies,

simplify it, there's no later from the state attorney

general, there's nothing else.

Or (b), it receives something and it looks at it.

And it was timely and it looked at it, and it wrote a little

decision, so there's no other issues, and it said, "No, we're

certifying."  And they send two things out, presumably, one

to Treasury, right, saying that it's certified, whatever --

whether it's just a line in the spreadsheet, or whatever it

is.  And they send some notice, presumably, then, at least in

the (b) scenario where the person wrote in, they send them,

"Here's our rejection of your borrower defense," or whatever
it is, and why.

And now the person wants to contest that, right?
Is it your view, then, that the way they contest that is they
go to the claims court?

MS. DRISCOLL: So not unless it's over $10,000. If
the offset amount is under $10,000, this claim falls under
the Little Tucker Act, which --

THE COURT: If it's under 10,000.

MS. DRISCOLL: Yes. Which has you, Your Honor, the
district courts, and the court of federal claims have
concurrent jurisdiction.

THE COURT: Okay.

MS. DRISCOLL: So I'm not saying you don't have
jurisdiction over this claim, I'm saying that you don't have
jurisdiction over the APA claim that they've brought. In
other words, it's been mispled.

THE COURT: That's what I'm trying to understand.
So in this case, each of the refunds, there's less than 10,
so there would be concurrent jurisdiction. So then -- but
play it out for me. Just -- because I'm not sure I fully
understand.

MS. DRISCOLL: Sure.

THE COURT: If they file the -- DOE gives the
notice -- forgetting this case for a moment, just in the

1   hypothetical, DOE sends a notice on December 15th, "We're

2   going to seize your fax refund," and on December 16th, they

3   want to appeal, and it's a $5,000 refund, they can go to the

4   court of claims and challenge the decision, or they can come

5   here.  But either way they do it under the Tucker Act?

6           MS. DRISCOLL:  So it's two things, Your Honor.  One

7   is that it's actually 31 USC, 3720A, which is the offset

8   provision for the TOPs program.  And it's not just the court

9   of claims, there are several district court cases, which I

10  can commend to you, also, where they never talk about the

11  APA, and it's always, frankly, confused me; and I realized

12  because they're considering it as a direct action under the

13  offset statute, and that's the substantive provision, not the

14  APA.

15          The jurisdictional provision is 1346.

16          THE COURT:  Hold on.  What was the first statute?

17          MS. DRISCOLL:  31 USC 3720A.

18          THE COURT:  So you're saying 3720 little A, not

19  parenthesis?

20          MS. DRISCOLL:  No, large, capital A.  3720A is the

21  number.

22          THE COURT:  All right.

23          MS. DRISCOLL:  And that's the Treasury offset

24  provision that allows all of this to happen in the first

25  place.

1          THE COURT:  Right.  That's the statute.

2          MS. DRISCOLL:  Right.  Then the jurisdiction --

3          THE COURT:  And that contains no -- or it does

4     contain an implied private right of action to appeal?

5          MS. DRISCOLL:  It has been implied by the court of

6     federal claims and by the district courts.  It is not

7     explicit in the statute.

8          THE COURT:  So there's an implied right of action

9     under that statute to bring a direct action challenging --

10         MS. DRISCOLL:  The offset.

11         THE COURT:  Challenging the offset, even before

12    it's been offset, but after it's been certified.

13         MS. DRISCOLL:  I don't think so, no.  After it's

14    been offset.

15         THE COURT:  So if DOE sends notice to someone, say,

16    on December 15th, saying, "We're going to seize your" -- on

17    December 15, 2017, they say, "We're going to seize your tax

18    refund," can they sue, or do they have to wait until the

19    money is actually taken?

20         MS. DRISCOLL:  Well, DOE has to give much more

21    notice than that.  I believe it's --

22         THE COURT:  Well, like in this case, it went out in

23    August, right?  65 days they'd have to file something under

24    the regulation.  Here the notice of seizure, we're going to

25    do it, went out in early August.  They would have 65 days

under the regulation.  So if someone filed in 65 days, that would be September or early October, and they would be within the 65 days.

I appreciate your faith in your client that they move with lightening speed, like the executive branch always does, but let's just say that they did it in a month, like that would be November; and you know, they looked at what was submitted, and they made a decision, they'd make the decision in November.  That would be pretty prompt, in the ordinary, practical view of the world.  And they sent a notice out in November that it is past due, it's legally enforceable, and we don't -- whatever you submitted to us doesn't persuade us that there's any reason not to seize your tax refund.

Now, the implied right of action takes hold?

MS. DRISCOLL:  The cases I've read, Your Honor, it's not until the tax refund is seized.  Because after certification, you still have the opportunity to request a hearing, pre-offset.

So there are two notices here.  There is one that goes out and says we're going to transfer your debt to the collections department, and then there's a second one that says we're going to certify your debt for offset.  And after the certification, the Secretary of Education's practice is you could still challenge the certification by requesting a hearing at any time.  The regulation says 65 days, Your

1    Honor, is correct, but the practice is at any time.  And I

2    believe that's right in the notice that's sent to the

3    borrowers.

4          MS. CONNOR:  Your Honor, if I may, I think there's

5    a really simple answer to your question, and it's, yes, you

6    could bring an APA challenge at that point in time, when an

7    objection, precertification, was denied by the department.

8          THE COURT:  Well, just here, on August 11th, as to

9    Williams, Education sent a notice of its intent to collect

10   through offset.  So this is when the 65-day rule -- or I

11   don't know if it's a rule, because it has a discretionary

12   exception.  But whatever it is, the 65 days would start

13   running on August 11th, right?

14         MS. DRISCOLL:  Yes.

15         THE COURT:  And so it's already been transferred to

16   DOE's collection procedures.  And then on December 9th,

17   Education certified the debt to Treasury.  So on that date,

18   on December 10th, if Williams had filed a notice and said, "I

19   want to be relieved," and DOE, December 9th, sent him a

20   letter and said no, on December 10th, you're saying he could

21   just file an APA action and repeal that decision.

22         MS. CONNOR:  Yes.  And the reason is --

23         THE COURT:  He could do it here, whether it's

24   $100,000 refund or $1,000.

25         MS. CONNOR:  Absolutely.  It doesn't matter about

the amount.  There's been no seizure yet, there's no ripe

illegal exaction claim.

The Tucker Act is an exclusive remedy for a money

damages suit against the United States.  This is not that

case, and your hypothetical wouldn't be that case, either.

That is a challenge to final agency action that's

appropriately pled as an APA case.  It seeks equitable

remedies not available under the Tucker Act.

THE COURT:  So if the statute has an implied right

of action, then why is there any question about exhaustion at

all?

MS. CONNOR:  I think that's a good question.

MS. DRISCOLL:  Your Honor, so it's two things, as

far as I can see.  The waiver of the sovereign immunity under

the HEA for the Secretary to sue and be sued, 20 USC 1082,

precludes any injunctive relief against the Secretary.  And

Your Honor has ruled that, but I would argue that some of the

declaratory relief sought in the complaint is intended to be

injunctive, right?  Declaring that you can no longer certify

the debts for offset.  So there's no ability to retain

that -- to attain that relief from the Secretary.

And then the implied right of action under 3720 --

and I can cite the cases to you, many of them have been cited

in our briefs on different points.  Some are in the court of

federal claims, some are in district court, that is to

1   receive the benefit of your refund back when your debt was

2   wrongly certified as legally enforceable.

3            MS. CONNOR:  That's not accurate.  It's when your

4   money was taken, pursuant to a certification.

5            THE COURT:  But see, the way I read that case that

6   you cited, I thought what that meant is that if your -- like

7   I think was that case.

8            If you have a claim -- for example, suppose --

9   suppose somebody -- we know there's a lot of identity theft,

10  right?  Certainly we hear about identity theft; there are

11  cases of identity theft in this court.  And suppose somebody

12  stole somebody's identity and applied for a federal student

13  loan in the name of a US citizen.  Right?  And the -- let's

14  just say the US citizen was you, Ms. Driscoll, and the person

15  who applied was somebody else, whoever they are, it doesn't

16  really matter.  And then you receive a notice one day that

17  your federal tax refund has been seized.

18           What I understood that to mean is that now you have

19  a claim that that was an illegal exaction.  The government

20  had no right to take your money.  You didn't know -- there's

21  no basis -- that's not your loan, and you could go to the

22  court of claims.  But that wouldn't preclude the earlier

23  claim.  I guess I'm not sure how that applies when you

24  transfer it over here.

25           But isn't that the distinction?

1          MS. DRISCOLL:  I understand what Your Honor's

2     saying.  I would argue that there is no remedy for the

3     certification until there's a harm from the certification.

4          THE COURT:  So wait.  So now let me -- so what

5     you're saying is --

6          MS. CONNOR:  We're going back.  We're going back

7     into the anti-injunction, the exhaustion arguments.

8          THE COURT:  Here's the thing that I don't

9     understand about that.  If that's the Government's position,

10    what the Government is saying -- I mean, if this is the

11    position of the Government in the interpretation of the

12    statute, that's fine.  But I just want to be clear that this

13    is what you're saying.  You'd be saying that then, for

14    example, somebody who is -- I know this isn't this case, but

15    we know that it's -- we know that it's at least been

16    asserted, because it's in the federal claims case asserted.

17    And we know it happens.  I mean, we all see cases of identity

18    theft all the time.

19          And somebody -- somebody receives a notice from DOE

20    that their tax refund is going to be seized, and they wish to

21    challenge that, either because, on the most extreme level

22    they say, "That's not my loan.  I never got that money, I

23    wasn't that person, this was a complete and utter fraud," not

24    a fraud by the school, necessarily, as we have here, but a

25    fraud by the --

1          Or it could be -- dial it back.  It could be just

2     that the person says, "I have a successful defense.  I've

3     sued the school in state court," or, "I have these state law

4     claims," or, "I need forbearance," or whatever; and you're

5     saying that they have no -- until the government -- the

6     government has now expressed its intent, unequivocal intent

7     to seize whatever refund they have, right?  They've heard

8     everything the person has to say.  DOE said no.  DOE said,

9     "We're certifying," and they're going off to certify.

10    Treasury is not -- has no forum, right?

11          MS. DRISCOLL:  Correct.

12          THE COURT:  Your forum is with the debtor agency.

13    And so now they just have to wait until the money is taken.

14    And then after the government takes the money, to which it

15    may have no right to take, then the person can go to court

16    and try to get it back?

17          MS. DRISCOLL:  I would argue that the

18    administrative process is there for that purpose.  Right?

19          MS. CONNOR:  Which administrative process?

20          MS. DRISCOLL:  I would have faith that if a student

21    who can show that the loan was not taken out in the student's

22    name, presents that information to the creditor agency, that

23    the debt doesn't get certified.

24          MS. CONNOR:  Your Honor --

25          THE COURT:  All right.  But the problem is that --

1    I have faith that in -- my faith, just like I said way back

2    when, is that the executive branch, in good faith, would be

3    trying to follow the law, and I assume in that circumstance,

4    they would be trying to follow it, which would be, "We don't

5    want to certify someone's tax refund."  But the reason

6    there's a judicial process is because you're entitled to

7    judicial review of whatever decisions there are.

8            And so what you are saying is that you can't get

9    judicial review -- you're saying two things, I guess.  One is

10   that you can't get judicial review until your refund has been

11   seized.  That's one thing you're saying, right?

12           MS. DRISCOLL:  Yes.

13           THE COURT:  Under any circumstance.

14           MS. DRISCOLL:  I don't know about "under any

15   circumstance."  But in terms of balancing --

16           THE COURT:  As a general matter, you can't get

17   judicial review until it's been seized.

18           MS. DRISCOLL:  What I'm saying is that APA doesn't

19   allow for that remedy, where there's another adequate remedy

20   in court.

21           And alternatively, if Your Honor --

22           THE COURT:  So you're saying -- so you're saying

23   that the reason -- where the APA has the exception, you can't

24   appeal it when there's another adequate remedy.  And the

25   adequate remedy is that if their money is seized, the

1  Government's assertion is that a post-deprivation remedy for

2  seizure of funds is an adequate remedy to an improper -- not

3  necessarily bad faith, but improper or wrongful, or arbitrary

4  and capricious, in the language of the APA, determination

5  that resulted in the seizure.

6          MS. DRISCOLL:  In combination with the

7  administrative process that exists for that reason, where the

8  debtor is allowed to present --

9          THE COURT:  But that's inevitable in every APA

10  case.  You can't invoke the APA exception, right?  You're

11  saying -- the reason that you're saying there's no review of

12  the decision is because the APA says that if you have another

13  non-APA judicial review remedy, law that's adequate, then you

14  don't get to invoke the APA and seek judicial review.  Right?

15          MS. DRISCOLL:  Right.

16          THE COURT:  So that presumes -- that exception can

17  never come into play, unless the APA is possibly applicable.

18  Because otherwise, you wouldn't be looking at that exception.

19  You only look at that exception when you have an APA kind of

20  case, but maybe there's another remedy at law that,

21  therefore, would say "no APA review," right?

22          MS. DRISCOLL:  Yes, Your Honor.

23          THE COURT:  So the adequacy of the

24  pre-administrative process can't really be -- I don't think,

25  unless you have a case -- would be relevant.  Because the

whole question of the application of the exception is about
the alternative process.  In other words, if there were no
adequate remedy at law, other remedy, no Tucker Act process,
nothing else, there would be APA review.

MS. DRISCOLL:  Correct.

THE COURT:  Or this argument wouldn't win.

MS. DRISCOLL:  Correct.

THE COURT:  And so then what you're saying is --
then it seems to me it's not about the remedy -- it's not
about the APA process, whether this is full and robust and
good and fair or not, or whatever, but it's about what's the
other remedy.  And the other remedy you're describing, that
remedy is not available until there's a seizure.

MS. DRISCOLL:  Well, the statute requires the
debtor to go through the process -- I'm sorry, the creditor
agency to go through the process of providing notice and an
opportunity to be heard, an opportunity for a hearing.  So
it's in the statute, as opposed to requirements of the APA.

We would argue that if the Court is inclined to
consider this to be an APA claim from certification based on
that action, and finds that there is no other adequate remedy
in court under the APA, so that the APA is the only remedy,
that exhaustion is required, and we could get into that.  But
there are alternative arguments, Your Honor.

THE COURT:  I guess the question that I have is, if

1    it's the Government's position that the -- that a person

2    can't -- that these people, whether -- if the Government's

3    saying that as to a certified -- as to when a federal agency

4    certifies a debt to the Department of Treasury to seize an

5    individual's money, their personal property, which is

6    otherwise indisputably their personal property, and that that

7    is a not-reviewable decision, period, ever, unless the money

8    is actually seized, and they have to wait until the seizure

9    occurs in order to challenge it, if that's what -- and,

10   therefore, that's why there's no -- that's a reason why

11   there's no review now; and the review comes if, and only if,

12   the money is seized.

13        Because you could have someone who they certified

14   who has no refund this year, right?

15        MS. CONNOR:  Your Honor --

16        THE COURT:  I guess my -- if that's your position,

17   you'd have to -- I'd be happy to give you leave to file a

18   supplemental brief.  That's not laid out in the briefs.  But

19   that's not intuitively obvious to me.  And I understand the

20   theory, but I just -- I would want to see it in writing, in a

21   memo.  You don't have to, but if you want me to consider that

22   argument, I'm happy to give you leave to file another

23   supplemental memo with respect to that.

24        But I get -- now I understand -- I understand it

25   better.  And what you're saying about why the Claims Act,

you're saying that the Claims Act is relevant because once it's seized, they have a -- they can proceed under the Tucker Act.  And if it's less than 10,000, they can proceed there or here.  And if it's more than 10,000, they can -- they're limited to the court of claims.

MS. DRISCOLL:  Yes, Your Honor.  I guess I didn't -- my intent was not to focus on the period between certification and refund, because these two plaintiffs, before the Court today, filed the action after refund.  Right?  After their refund was offset.  So they have another remedy, and I wasn't focused on the period in between certification and offset.

THE COURT:  So but if they have another remedy, but that remedy is available to them in this court, you concede.

MS. DRISCOLL:  Yes.

THE COURT:  So it doesn't go to my subject-matter jurisdiction.  Right?

MS. DRISCOLL:  It goes to jurisdiction over the APA, because the APA only --

THE COURT:  So it goes to, really, a question of whether, if I agreed with you on this, as applied to these people, they would need to assert a Tucker Act claim, and they would need to replead -- they need to amend their pleading to assert a Tucker Act claim.

MS. DRISCOLL:  Yes.

1          THE COURT:  Once they asserted a Tucker Act claim,

2     then they would have a cause of action that would bring them

3     here that would support the Court's jurisdiction.  And then

4     we would have pretty much -- then under the Tucker Act, we

5     would --

6          Would we be just arguing about the merits, or would

7     there be an exhaustion issue?

8          MS. DRISCOLL:  It would -- the cases that

9     consider -- they still require exhaustion under TOPs.  But

10    the cases -- once the refund is seized, the issue is whether

11    the debt was legally enforceable on the merits.

12         THE COURT:  Well, wouldn't it also be whether the

13    decision to certify was arbitrary and capricious, in light of

14    whatever arguments were before --

15         In other words, I guess my point is that, like, if

16    somebody -- whatever issues that the -- were considered that

17    went into certification, would be at issue in the Tucker Act.

18    And so they would be entitled to raise there whatever -- you

19    would have all your arguments that the AG's memo isn't to be

20    considered, and they would have all their arguments that the

21    AG's memo to be considered, and I guess it would just be a

22    pleading form.  And so my view would be if you think that's

23    necessary, you can file a supplemental memo saying what your

24    view is and why.

25         But it would seem to me that if that -- even if I

1  agreed with you, okay, and if it -- if I reviewed it and

2  agreed with you; and after, if they needed to respond,

3  respond.  It seems to me that then, under Rule 15, I can't

4  imagine why there wouldn't be good cause to allow them to

5  replead, because the pleading would just be -- it would

6  really be a form, it would be a form of pleading, because all

7  of the arguments would be fundamentally the same.

8           Would Tucker Act review be limited to the record?

9           MS. CONNOR:  Your Honor, may I speak to this?

10          THE COURT:  Yes.

11          MS. CONNOR:  First of all, I think that you're

12 accurately stating what their position is, which is that up

13 until the time of certification, so for these plaintiffs

14 until about -- well, the 60-, 65-day window, middle of

15 October 2015, the certification happens in December of 2015,

16 between the close of the window, let's say they had submitted

17 an objection.  Their position is actually that, if they had

18 submitted an objection going to legal enforceability, and

19 another arm of the Department down the hall hadn't reached a

20 decision on that yet, there would still be no bar to

21 certification.  That would not be a legal bar to the

22 collection, involuntary seizure through offset.

23          THE COURT:  I don't understand that.  The

24 regulation says that in any proceeding to collect a debt,

25 including a tax refund offset proceeding -- this is DOE's

regulation -- you can assert a borrower defense.  So how can
they -- if a borrower defense is being asserted, how can they
certify something before they determine whether the borrower
defense was valid or not?

MS. CONNOR:  Because they would determine that it
hadn't been determined yet.  That's their position.  It comes
out in their sur-reply.  "A pending borrower defense claim
does not create a legal bar to collection."

THE COURT:  You mean in terms of their mootness
argument.

MS. CONNOR:  No.

THE COURT:  Or their not-ripe argument.

MS. CONNOR:  I think that it really is going more
to whether it was arbitrary and capricious.  She's saying
it's not arbitrary and capricious --

THE COURT:  Is that the DOE's position, that if
someone files a borrower defense while it's pending to be
adjudicated, you can certify, even though it's pending and
hasn't been resolved?

MS. DRISCOLL:  The position is that under the
regulations you can, but that the Department of Education
itself -- and I think it's different.  It's actually after
certification.  So we didn't discuss it before certification.
But once a debt is certified, if a borrow defense claim is
filed after, which is outside the statutory window, then

1    there's no obligation on behalf --

2            THE COURT:  After a certification or after the

3    65 days?

4            MS. DRISCOLL:  After certification.  Then there's

5    no obligation on the part of the Department of Education to

6    withdraw the certification until the claim is resolved.  As a

7    matter of administrative discretion, the Secretary does.

8            MS. CONNOR:  Your Honor, if it's not their position

9    that during that 65-day window a borrower who objected on the

10   grounds that their loan was not enforceable because of a

11   school, like Corinthian's, misconduct, if it is not their

12   position that that is not a bar to legal collection, they

13   need to refile their sur-reply, because that is clearly what

14   they say.  And if we can't be clear about their position, I'm

15   a little at sea right here.

16           MS. DRISCOLL:  So the borrower -- so the request

17   for 65-days notice of hearing is actually different than the

18   borrower defense regulation, which says is a defense to a tax

19   enforcement proceeding.  Right?  A tax offset proceeding.  A

20   tax offset proceeding starts when the debt is certified.

21           MS. CONNOR:  What --

22           THE COURT:  Well, actually, the regulation says "in

23   any proceeding," including the enumerated ones.

24           MS. DRISCOLL:  Right.

25           THE COURT:  So your position is that then prior --

1　the proceeding that involve whether to certify are not debt

2　collection proceedings?

3　　　　MS. DRISCOLL:  I don't know that there is a

4　proceeding enumerated that involves whether to certify.

5　　　　THE COURT:  Well, there is -- I think that's what

6　DOE's regulation say.  They say, "We're thinking about

7　certifying.  We're giving you notice."  That's what the whole

8　notice is, right?  "We give you notice that we're about to

9　certify and" --

10　　　　MS. CONNOR:  They have to make an independent

11　determination that there's no bar to legal collection.

12　That's the duty that Congress has put on the Secretary.

13　　　　In addition to that, the Secretary needs to give an

14　opportunity and notice -- notice and an opportunity for the

15　borrower to present an objection to that collection.  Of

16　course that's a proceeding.

17　　　　MS. DRISCOLL:  And of course that notice and

18　opportunity to present that objection was given here, and

19　there's no dispute that the notice was given and

20　appropriately given.  There's no challenge to the notice.

21　They indicate that there's no proof of receipt, but don't

22　actually, you know, challenge the validity of the notice in

23　the compliance with the statutory requirements.  So we're

24　not -- that's not the case here.  There's no certification

25　with a pending borrower defense.

1          MS. CONNOR:  That's not accurate, either.

2          THE COURT:  Well, that's really just one of the

3     questions, I think, before the Court.  Right?  That

4     assumes -- that assumes -- I haven't decided either way, but

5     that assumes that the AG's letter, for example, is not --

6     doesn't invoke a process.

7          And so certainly -- certainly I think the record is

8     clear that there's no piece of paper signed by either Ms. --

9     by Williams or Taveras that was filed with DOE, prior to the

10    December 2015 certifications.  But whether -- whether there

11    was -- whether the process had been initiated or not, that's

12    one of the things that the two of you dispute.

13         MS. CONNOR:  I think it's not even whether the

14    process was initiated or not.  I think it has to do, Your

15    Honor, with what information the Secretary had, what she had

16    knowledge of.  Because this duty to determine legal

17    enforceability is independent of a borrower's right to

18    object.

19         THE COURT:  Let me ask you this question once

20    you're on that.

21         Why is legal enforceability, as defined by the

22    statute -- not by what we would ordinarily think it to

23    mean -- why is it anything more than, one, that the debt is

24    past due, which seems pretty clear here, and two, whether

25    there's a bar to collection?  Not whether there's a defense,

1 not whether there's a breach of contract or something, but

2 there's a bar. And the examples, which are not exhaustive in

3 the statute -- unless Ms. Driscoll has a different reading.

4 MS. CONNOR: It explicitly says "without

5 limitation."

6 THE COURT: Right. But the two examples are sort

7 of the bankruptcy stay and a statutory bar to collections.

8 So they seem in the nature of things that, say --

9 For example, it would seem to me that if a court

10 issued an order that said, "You can't collect debts from this

11 person," for whatever reason, or if there's -- I don't know

12 if there's a federal statute with respect to members of the

13 armed services, serving in combat overseas, that things can't

14 be collected from them, that those are bars to collection

15 that are different than the kinds of defenses to the

16 collection that are at issue here.

17 And I guess the question is, why does the statute

18 for legal enforceability, how do you read it to go beyond

19 that?

20 MS. CONNOR: Well, I read it to go beyond that

21 because it's embedded in the Treasury Offset Program, which

22 is an extraordinary power that is given to creditor agencies,

23 for them, without any judicial oversight, to take the

24 property of individuals. And so within that context, there's

25 a duty on the Secretary to determine that there is not a bar

1    to collect -- legal enforceability is a characteristic of a
2    debt that essentially means that the creditor agency, here
3    the Secretary, could go to court and collect on that debt.
4    And so it's just a fact that here, the Secretary is aware
5    that she could not go to court and collect on this debt.  She
6    couldn't even file the suit.
7          THE COURT:  But why isn't it like a -- just like in
8    the private sector world, you know, you're doing business --
9    you do business with --
10          Company A and Company B do business.  And Company B
11   owes Company A money.  B owes A money, and A owes B some
12   money, and they just set it off; and they don't pay them the
13   full amount they owe, and they say, "You owe us this."  And
14   they might be able to -- and they all could go to court over
15   it, but they have the funds.
16          And why isn't this just sort of a government
17   version, with some extra procedural protection, of a private
18   sector setoff?
19          MS. CONNOR:  Well, I think there's two reasons, one
20   just is statutory interpretation.  If all it meant was that
21   there had to be a determination, and the window had passed,
22   that one-time 60-day window for an affirmative objection had
23   passed --
24          THE COURT:  Well, let me ask you this, maybe, to
25   make it clearer.

1          MS. CONNOR:  Okay.

2          THE COURT:  I have a two-part question.

3          One, why does the statute -- what about the

4   language of the statute reaches breach of contact or fraud

5   kinds of defenses?

6          MS. CONNOR:  Uh-huh.

7          THE COURT:  And two, is it your view that the --

8   the question that I'm wondering about is, why isn't the

9   statute itself, for legal enforceability, more -- read

10  more -- you can call it "narrowly," more like the Government

11  says it's read than you say; and (b), why don't the

12  regulations of DOE contemplate a much broader view?

13          In other words, the DOE regulations say that in any

14  collection proceeding, including an offset -- I'm just

15  looking for the regulation -- you can assert a borrower

16  defense.  And a borrower defense is defined, but it includes

17  anything -- essentially it can be anything that's a defense

18  under state law.  All the kinds of things that you might

19  assert in a private action, right?

20          MS. CONNOR:  Uh-huh.

21          THE COURT:  So why doesn't that provide a

22  technician then, or why isn't the structure here that you can

23  go to DOE, you can raise these kinds of things?  If there is

24  a notice, you could raise all of that.  DOE will consider it,

25  and then -- and then it does what it does.

1    And then if you appeal from that, however the

2 format is, that then the regulations sort of have a --

3 contemplate decisions that are broader and, therefore,

4 reviewable than the statute.

5    MS. CONNOR:  I'm not sure that I 100 percent

6 understand the question, Your Honor, but I think --

7    THE COURT:  It's kind of a long, convoluted

8 question.

9    MS. CONNOR:  Perhaps what we're talking about is

10 sort of a background due process norm that I would read into

11 this, which is that, contrary to the Secretary's position, if

12 a borrower objects to a notice of an impending involuntary

13 collection, of course the Department can't take that action

14 without addressing the evidence or the objection, and then

15 say there's an adequate remedy because you can go to the

16 court of federal claims with an illegal exaction claim.

17    THE COURT:  Well, I guess take it piece by piece.

18 The agency sends a notice that they're going to seize the

19 money.  And what -- what you are -- I guess this is how it

20 plays out in this case, to try to come back here:

21    You're pressing the notion that legally enforceable

22 encompasses not just statutory bars to collection, but also

23 defenses to collection, like breach of contract or fraud,

24 which is essentially the kinds of reasons that these two

25 borrowers have to advance with respect to their debt, in a

general way, without -- not saying that by agreeing to it,

that you're limiting.  But that seems to be the genre of

their defenses to repayment.  Right?

And you're saying those are things that the -- that

in order to certify a debt, that this -- within the meaning

of the statute, the Secretary has to make a determination

about that.

MS. CONNOR:  Uh-huh.

THE COURT:  And that that determination has to be

based on two things:  whatever happened in whatever

administrative process; and (b), some set of information that

the Secretary -- Secretary can't like close her eyes --

MS. CONNOR:  That's right.

THE COURT:  -- to the things that she knows about

Corinthian, and it has to consider that, too.

MS. CONNOR:  Right.

THE COURT:  And so on that basis.

So as to that theory, my question is, what in the

statute lets you reach those other things?

MS. CONNOR:  Well --

THE COURT:  As opposed to the regulations seem to

contemplate, clearly, and I think the Government agrees with

this, that the Secretary certainly can set aside a debt on

all those defenses to repayment.

MS. CONNOR:  Yes.

1       THE COURT:  And presumably, the declination to do

2  so, if the Secretary declined to do so, that's presumably

3  reviewable in some way, measured against the regulations, but

4  not necessarily a duty on the regulation.  That's kind of

5  what I'm wondering about.

6       MS. CONNOR:  So Your Honor, it's a nonexhaustive

7  list in the statute of those kinds of statutory bars to

8  collection.  Certainly, I think, the borrower defense

9  regulation, the Secretary's regulation does create a

10  mandatory duty for the Secretary to resolve that claim.  And

11  so I think when there's a pending borrower defense

12  application, that is a statutory scheme that precludes

13  involuntary collection until that is finished.

14       I think that further --

15       THE COURT:  Say that again.  So you're saying they

16  give notice that we want to seize your refund, the

17  August notice, that kind of notice.  You're saying that once

18  the process is invoked of a borrower defense, they can't

19  certify until that process is concluded; and they decide,

20  yes, we sustain the borrower defense, or no, we don't.

21       MS. CONNOR:  That's right.  That's why I assume

22  we've been arguing for this whole time about whether the

23  Massachusetts letter was or was not a borrower defense.

24  Because it occurred before the certification, and obviously

25  it's outstanding and obviously --

1        These plaintiffs remain certified.  They referred

2   Mr. Williams again in 2016.  So it's ongoing.  That's why the

3   equitable relief is needed here, to vacate, under the APA,

4   this determination.

5        THE COURT:  All right.

6        MS. CONNOR:  So yes.  But I think separate from

7   that, every court that looks at this statute and asks, it's:

8   What does this mean, a determination of legal enforceability?

9   They go to *Black's Law Dictionary*, and an enforceable debt

10  with no bar is one that a party could go to court and obtain

11  a judgment on.

12       And here you brought up before the distinction

13  between private parties and the Government.  We're talking

14  about the Government.  You've said it before that the

15  Government acts in good faith.  The Government cannot --

16       THE COURT:  I said I presume they act in good

17  faith.

18       MS. CONNOR:  Sure.

19       THE COURT:  I didn't say they did.

20       MS. CONNOR:  The Government can't sue on a

21  time-barred debt.  The Government couldn't come into court

22  here in Massachusetts and sue on these plaintiffs' debts.

23  Why?  Because it knows that there's a judgment entered, that

24  there is a valid defense, that Corinthian violated

25  Massachusetts state law -- that's more.  That's a judgment.

It's more than just a cause of action under state law, it's a judgment.

The judgment that was entered in August 2016 awards restitution on the basis of money that plaintiffs themselves paid. That is the restitution that was ordered in that case. The Secretary is aware of it.

THE COURT: So the scope of that restitution is just the money that the plaintiffs did pay, not the money that they owed --

MS. CONNOR: The money -- it's fungible, because it's the tuition that was paid, they paid it through the money that was given through the loans.

THE COURT: I see. They didn't pay more than the loan.

MS. CONNOR: No. It's probably the loan -- it's a private loan. It's more than the federal loan, because some of them may have gotten Pell grants, some of them may have gotten private loans.

THE COURT: I see. All right.

MS. CONNOR: It's the revenue.

THE COURT: But it includes -- they are entitled to receive restitution under that judgment for, among other things, the entire proceeds of the federal loan.

MS. CONNOR: Exactly. These plaintiffs. The Secretary knows that. I think the Government cannot go and

1    obtain a judgment on this debt.  They can't initiate that

2    case.  There's the *Schaefer* case that we cite.  They can't do

3    it.  They can't sue on a time-barred debt.  Maybe private

4    parties can, maybe that wouldn't be a violation of the FDCPA.

5             THE COURT:  But what would prevent them from

6    bringing the lawsuit against Williams and Taveras for the

7    amount of money on the federal loan now?

8             MS. CONNOR:  Well, I think a few things that --

9             THE COURT:  Or how would the judgment preclude it?

10            MS. CONNOR:  Well, because I think there would

11   be -- there had be an intervening collateral estoppel

12   assessment, I assume.  But they know embedded--

13            THE COURT:  Right.  But they're not in privity.

14   Like the offensive collateral estoppel, which is what

15   Williams and Taveras would have to assert, the DOE would

16   probably succeed in arguing that it's not in privity with

17   Corinthian.  And --

18            MS. CONNOR:  Oh, it is.  It was.  They had a

19   program participation agreement.

20            THE COURT:  All right.  So then the question -- but

21   collateral estoppel is sort of an equitable doctrine in the

22   end, anyway.

23            MS. CONNOR:  Uh-huh.

24            THE COURT:  So even if they met the requirements,

25   the question would be would a court -- would the reasons to

1  not require it there, where Corinthian didn't appear and

2  where it was charged with fraud, it's unlikely they would

3  succeed on an offensive collateral estoppel claim.  And the

4  loan agreement itself between the borrow and -- at least the

5  master agreement, presuming it's the same -- provides that

6  things like fraud or misrepresentation may be grounds to --

7          MS. CONNOR:  Right.  And that would be played out

8  before a judge.

9          THE COURT:  Right.

10          MS. CONNOR:  Here we're talking about an

11  extrajudicial process with no intervening oversight.  That's

12  why this independent, affirmative requirement is here,

13  because it's a drastic remedy.  It involves, in these

14  plaintiffs' cases, seizing earned income tax credits.  It's

15  drastic.  So the question isn't:  Do you think you could

16  possibly get away with it.

17          And I think -- this hasn't come out in this case,

18  but I assume --

19          THE COURT:  I guess the thing that I'm wondering,

20  though, just in terms of the statute, is given what the

21  statute -- the way it defines "legally enforceable," and it

22  seems to provide a definition just for purposes of this

23  section, and the examples it gives are ones prohibiting the

24  process, collection process, that isn't what they're saying

25  is that, you know, you can -- like you can certify the debt.

1    If it's past due, and there's no bar to collection, you can
2    certify it, and that's it.  And Treasury -- Congress set that
3    scheme up, that's the only thing.
4         The agencies can choose, as DOE seems to have, to
5    have a more expansive review process.  But in -- and consider
6    more things.  But that the legally enforceable itself --
7         MS. CONNOR:  In what sense is the review process
8    more expansive than what's required in the statute, Your
9    Honor?
10        THE COURT:  Give me a moment, and I'll tell you
11   what I was wondering about that.
12        In 34 CFR 685.206.
13        MS. CONNOR:  The borrower defense regulation.
14        THE COURT:  Yes.  It says in sub (c)(1), "In any
15   proceeding to collect on a direct loan, the borrower may
16   assert as a defense against repayment any act or omission of
17   the school attended by the student that could give rise to a
18   cause of action against the school under applicable state
19   law."
20        So the kinds of defenses that are being asserted
21   here certainly fall -- the kinds of merits defenses to
22   collection --
23        MS. CONNOR:  That's right.
24        THE COURT:  -- fall within that definition.
25        "These proceedings include, but are not limited to,

tax refund offset proceedings under 34 CFR 30.33."

So that clearly seems to be a much broader scope of considerations than -- if I'm reading the statute -- if my suggestion is that reading the statute is correct, that it's more narrow, that this is a much broader set of considerations because the statute doesn't use language like that. And so what it would seem to be is establishing a system where the Congress said you can certify a debt, if it's past due and there's nothing that prevents you from collection activity.

DOE seems to say: But before we do that, we'll consider a lot more things.

MS. CONNOR: I think that that statute, if I'm understanding, it does impose upon the Secretary a duty to consider a broader range of things and, perhaps, a strict reading of --

THE COURT: How?

MS. CONNOR: Well, because it recognizes this -- that embedded in every loan is a defense or a right to cancel that loan based on school misconduct. That's something that a borrower could enforce in court. It's more complicated here because the lender here is the federal government. But just as between a private lender and any borrower, state law consumer protection acts do give a right to --

THE COURT: But -- right. But think about this

1  statute as one of general application.

2       MS. CONNOR:  Uh-huh.

3       THE COURT:  It applies to not just DOE, it applies

4  to the entire federal government, to everything.  It

5  applies -- for example, you probably don't know this, but my

6  understanding is, not based on this case, but that it even

7  applies when the federal government thinks that it reimbursed

8  an employee incorrectly for something, it will claw back --

9  if it doesn't get the money from the employee, it will claw

10  back the refund under -- it can invoke this process.

11       MS. CONNOR:  Uh-huh.

12       THE COURT:  So it -- in reading this sort of

13  general statute, why -- where the language is so -- seems

14  kind of specific, why do I -- why should I read it to

15  encompass sort of any possible defense to whatever the --

16       MS. CONNOR:  I think the question in every case in

17  the statute of general applicability is could that creditor

18  agency go to court and get a judgment.

19       THE COURT:  But isn't that a merits question?  Like

20  to get a judgment requires -- like maybe they could -- you

21  know, there's some things that might be, like statute of

22  limitations, that cut it off.  But there's others that might

23  be --

24       Let's say there's a breach of contract question.

25  Could they go to court?  Sure.  Could they seek a judgment?

Sure.  Would they win?  Maybe.  There might be viable

defenses to breach of contract that might not be clear.  So

can they not certify the debt until the agency has sort of

adjudicated that breach of contract?  Some other scenario.

MS. CONNOR:  Certainly if it's been presented to

them, which it has been here.  Yes.  I think independently --

I read it more broadly, Your Honor, which is that there is an

independent duty on the agency to not stick its head in the

sand and know of its knowledge that a valid defense to that

loan has been established.  So -- and I think that that's

where the fact that we're talking about the government comes

into play.

I think the Massachusetts Attorney General, in

their amicus brief, made a point, which is that in a statute,

the Fair Credit Reporting Act, that applies both to any

furnisher of information to a consumer credit reporting

agency, private or governmental, there's liability there

created there for reporting information when the furnisher

knows or reasonably should know that it's inaccurate.  And

that applies broadly.  Here we're talking about the

government.

THE COURT:  Do you have a claim under that statute?

MS. CONNOR:  No, no.  By way of analogy.  I'm

saying that when we're talking about the government, there is

a higher burden that this statute places on them.  And you

1    can see that by the fact that it created --

2         THE COURT:  So is that burden placed on them

3    because of specific words in the statute or because the

4    idea -- there's due process principles that say the

5    government shouldn't be seizing property, even if the person

6    hasn't objected -- assuming that I reach the conclusion that

7    they hadn't objected -- when there's the government has good

8    reason to know that it's either -- that there's a problem

9    with the debt, so to speak, not a bar to collection but one

10   of these other problems; and that, then, is that that I

11   should read the statute in light of those due process

12   principles, or is it that that is a Constitutional --

13   separate Constitutional limitation?  Fine under the statute,

14   but there's this Constitutional?

15        MS. CONNOR:  I would never argue against reading

16   the statute in relation to due process, but I think

17   contextually it's in legal enforceability; and that term,

18   when you look at the meaning of it, means that you can go to

19   court and get a judgment on it.

20        THE COURT:  I see.  Okay.

21        So what about the -- you read the statute the other

22   way, right?

23        MS. DRISCOLL:  I do, Your Honor.  And may I just

24   respond to a few points?

25        THE COURT:  Yeah.

1          MS. DRISCOLL:  One is that both of the plaintiffs'

2     debts are certified but inactive.  There's no danger that

3     anything will be seized, as long as they're inactive.

4          Secondly, there are three cases cited in our briefs

5     where the borrower --

6          THE COURT:  Why is Williams inactive?

7          MS. DRISCOLL:  I'm sorry?

8          THE COURT:  Why is Williams inactive?  I know --

9     the other one is inactive because she filed, at some point,

10    a --

11         MS. DRISCOLL:  Because of this litigation, Your

12    Honor.

13         THE COURT:  Oh, I see.

14         MS. CONNOR:  Although, Your Honor, that didn't

15    preclude him from being referred to Treasury for offset after

16    this litigation.

17         THE COURT:  Being referred to what?

18         MS. CONNOR:  To Treasury again, to being certified.

19         MS. DRISCOLL:  Which has been --

20         THE COURT:  I'm not sure really the litigation -- I

21    don't think that you can argue because you've -- if your

22    client has stayed its hand pending judicial determination of

23    what's here, that might be prudent, that might be wise,

24    appropriate, all sorts of things, but I don't think that

25    renders the underlying claim moot.

1          MS. DRISCOLL:  No, no, I'm not arguing that.  I'm

2    just correcting the factual assertion that they were both

3    certified.  That is not the case.

4          MS. CONNOR:  What my colleague is referring to is a

5    matter of administrative grace, that they have decided they

6    don't have to at all, is their position, even for

7    Ms. Taveras, who has submitted a borrower defense claim to

8    decertify.  That's contrary to what the statute says.  But

9    they're putting them in an inactive status, which is nowhere

10   in the statutory or regulatory scheme.

11         MS. DRISCOLL:  The Department of Education, as Your

12   Honor expects, is trying to do the right thing, which is more

13   than what the statute requires.  So this is their practice,

14   and I'm surprised it's a problem.

15         But there are three cases, Your Honor, all of which

16   are under 3720A, as I said, and not APA actions, where the

17   plaintiff did assert a statute of limitations argument, and

18   the court found that the debt was still legally enforceable

19   and read the statute of limitations differently.  They're all

20   in our briefs, *Foster vs. Alexander*, which is District of

21   D.C., 1993; *Hurst vs. Department of Education*, which I

22   believe the plaintiff cited, District of Kansas, 1998; and

23   *Thomas vs. Bennett*, Eight Circuit, 1988.

24         THE COURT:  Let me ask you this question.  Why

25   should -- to each of you.  Either why should I read the AG's

letter as invoking a process for the People in Exhibit 4 --
Exhibit 4 is the one that contained these two plaintiffs.
And why shouldn't I?

MS. DRISCOLL:  I would obviously say you shouldn't,
Your Honor.  The letter itself from the AG says it's a group
discharge application.  And you now have Exhibit 3 before
you.  Exhibit 3 sets out in great detail all of the
information that we've argued in our brief was required for a
borrower defense claim at that time, the name, Social
Security number, date of birth, dates of enrollment, specific
actions the school took against you that caused you to rely
on them, how you were injured, how this has affected your
life.  There's a whole list of requirements that we've cited
in our brief.  And if you review each of the 47 applications
at Exhibit 3, each of them sets it out.

Exhibit 4 is just:  Oh, and these students also
attended Corinthian, and they may have been defrauded, too.
But there's no specific assertion.

THE COURT:  I don't think it says "may," I think it
says "were."

MS. DRISCOLL:  Well, the Department of Education --

THE COURT:  I'm not saying they were defrauded.

MS. DRISCOLL:  Right.

THE COURT:  But if you're saying what the AG said,
I think what the AG said was they were defrauded.

1          MS. DRISCOLL:  So all of the regulations all refer

2   to the fact that a borrower may assert a borrower offense.

3   We would argue that each of the 47 borrowers who did, with

4   the Massachusetts Attorney General's submission, are treated

5   as such, and that commenced the process.  But that the 7,200

6   who are listed in the spreadsheet did not, and they didn't --

7          THE COURT:  What about it is the reason they did

8   not?

9          MS. DRISCOLL:  Because they did not provide the

10  information required to be provided for the Department to

11  consider their claim.

12         THE COURT:  What information was missing?  So it

13  didn't have anything to do with the Attorney General?

14         MS. DRISCOLL:  No, they -- well, whether -- if they

15  had joined in Exhibit 3 and provided the information required

16  to be provided under the -- that the Department was

17  requiring --

18         THE COURT:  Is it the signature that you're looking

19  for, or is it content information?

20         MS. DRISCOLL:  No, it's how they personally have a

21  claim.  The Department of Education's letter back to the

22  Attorney General says, "Hey, you didn't give us this; you

23  didn't give us the information for Chelsea.  We don't have

24  job misplacement" --

25         THE COURT:  It doesn't say, "We're not going to

consider" -- it doesn't say, "Hey, people in Exhibit 4 didn't

invoke a process.  We're not treating you as doing anything

for them."  And it doesn't say, "We're not doing a group

discharge for them.  We're not" -- it doesn't say --

It says generally there's certain information

missing, it identifies different types.  But it doesn't say

anything affirmatively either way about how it's treating the

people on Exhibit 3 or 4.

MS. DRISCOLL:  Agree.  Agreed.  It doesn't say that

the --

THE COURT:  Or ask for clarification.

MS. DRISCOLL:  Correct.  The difference is, in the

subject line, it says "Group Applications," with an "S,"

meaning more than one, as opposed to group discharge

application, which is how the Massachusetts Attorney General

subject line comes in.  So they're viewing it differently,

although not explicitly stated.

Once the Massachusetts Attorney General -- or

rather the Department of Education conducts its own

investigation, it has presumptive findings of fraud, based on

all the information in front of it, based on dates of

enrollment.  And neither of these two plaintiffs fall within

the dates of enrollment.

So even if the certification was improper because

this is a borrower defense, if that's the argument here, once

they did their investigation, determined they were outside
the findings of fraud and there was no additional information
from the plaintiffs, they had no obligation to decertify the
debts.

THE COURT:  So I'm wondering this --  oh, I see.
You're saying that even if the AG's letter was sufficient to
invoke a process, that even though DOE took the view,
plainly, because it didn't include it in the record, that
this didn't invoke a process.

MS. DRISCOLL:  Right.

THE COURT:  That then DOE did consider, looked at
everything, and since it didn't claw back the certification,
but did create some presumptive categories, that I should
view that as meaning that had it even conducted it, there
would be no prejudice because --

Is that what you're saying?

MS. DRISCOLL:  The debts are legally enforceable.
There was no -- this information did not change that
determination.

THE COURT:  Suppose somebody writes to DOE.  DOE
sends the notice, and somebody writes in and says:

"The school that I attended lied to me.  They
promised me that there would be this graduation rate.  They
promised me that there would be this kind of teacher/student
ratio.  They promised me that the teachers would be of a

certain caliber.

"I went to the school, I went to every program, I completed it. The teachers weren't of that caliber. They weren't Ph.D. level teachers, they were people who hadn't even graduated high school. They weren't skilled in teaching, they didn't know how to teach, the classes were terrible. They met intermittently. The employment rates of getting employment were a fraud, not true. All of the things that I relied on to go to this school are untrue, and I ask you to cancel my loan."

That's the response from the borrower when they get the notice, the kind of August notice that's going to be certified.

DOE looks at it and says, "It's past due," right? It is. And the borrower concedes that it's past due. Okay.

And the borrower says, "I'm not in bankruptcy. I'm not aware of any other statutory bar to collection."

And the Secretary is not aware of one.

Can the Secretary just say, "Well, it's legally enforceable because there's no bar, and so we're certifying it"?

MS. DRISCOLL: Under the regulation, yes. There is no legal bar to collection.

THE COURT: Under which regulation?

MS. DRISCOLL: Under --

1        THE COURT:  I'm asking you, can -- compliant with

2    all of the applicable law and regulation in that scenario,

3    can the Secretary certify the debt to Treasury?

4        MS. DRISCOLL:  I understand the question.  Under

5    the regulation for what legal enforceability is and the

6    narrow determination that's required, my answer is yes.  The

7    Secretary would not because of its policy under the borrower

8    defense regulation.

9        THE COURT:  But is that regulation a policy, or is

10    that regulation law?

11        MS. DRISCOLL:  It is law, but it says, "The

12    borrower may assert as a defense to repayment."  There is

13    nothing in here that requirements the stopping of the process

14    during the defense to repayment being asserted, as opposed to

15    some other --

16        And I don't have examples, and I should, Your

17    Honor.  But I believe under the other processes, the borrower

18    can start, like, the discharge processes based on death or

19    forbearance, or there's a September 11th discharge, that

20    those actually trigger an automatic stoppage.  And this one

21    does not.

22        THE COURT:  So it's discretionary -- well --

23        MS. DRISCOLL:  Education would not certify --

24        THE COURT:  So does the Secretary have discretion

25    to say, "I'm not even going to read this"?

1    MS. DRISCOLL:  I don't believe so, Your Honor.

2    THE COURT:  Not because of the regulation, right?

3    MS. DRISCOLL:  Right.  The borrower may assert as a

4    defense to repayment.

5    THE COURT:  If the borrower does, the Secretary has

6    to read it?

7    MS. DRISCOLL:  Correct.

8    THE COURT:  And the reason that the Secretary has

9    to read it is because of her regulation.

10    MS. DRISCOLL:  Yes.

11    MS. CONNOR:  Your Honor, the Treasury regulations

12    also say that the opportunity has to include ability to

13    submit evidence --

14    THE COURT:  Any evidence.

15    MS. CONNOR:  Yes.  And that the agency won't

16    certify the debt until it has reviewed that evidence.

17    THE COURT:  All right.  So once it's -- so -- so

18    but what's the -- is it -- is it an unreviewable act of

19    grace, whether a borrower -- so the Secretary receives

20    this -- these borrower defense information.  They,

21    presumably, assuming that the Secretary has an obligation to

22    read it and consider it, either under the Treasury regulation

23    or under her own regulations, can the -- is it -- is the

24    standard of whether she grants relief, given whatever the

25    particular set of facts are, pure grace that's unreviewable?

1           MS. DRISCOLL:  Your Honor, I don't know the answer

2     to that, and I don't know that we need to in this case.

3     Because one is that the plaintiffs never did that.  Right?

4     And if Your Honor considers the Massachusetts Attorney

5     General's submission to be some kind of borrower defense on

6     their behalf, it did not contain that information relating to

7     them.  And it says right in the promissory note --

8           MS. CONNOR:  Your Honor --

9           THE COURT:  Hold on one second.

10          MS. DRISCOLL:  -- that the students sign, "In some

11    cases, you may assert as a defense to collection of your loan

12    that the school did something wrong or failed to do something

13    that it should have done.  You can make such a defense

14    against repayment only if the school's act or omission

15    directly relates to your loan or to the educational services

16    that the loan was intended to pay for and if what the school

17    did or did not do would give rise to a legal cause of action

18    against the school, under applicable state law.  If you

19    believe that you have a defense to repayment of your loan,

20    contact the direct loan servicing center."

21          THE COURT:  Right.  But that, like -- so I don't

22    know that I understand that to mean that the only way a

23    borrower can prevail is if the borrower, herself or

24    himself -- that you have to -- that you have to take evidence

25    from the borrower; that, in other words, I could certainly

1    see how you could have -- you could have a program officer

2    who says, "Every day I went there I was paid a commission for

3    everybody I signed up.  I worked from this date to this date.

4    I talked to the following list of people; I lied to all of

5    them, and this is what I said"; and that it would be -- I'm

6    not saying it would have to, but one could imagine an

7    inference, then, being drawn that all of those people were --

8    fit within that rubric, whether the Secretary would draw that

9    inference, or whoever the decider was, or whether the

10   circumstances.

11          But the reason that I'm pressing a little bit is,

12   in part, understanding what the criteria is makes a

13   difference in trying to evaluate whether the letter from the

14   Attorney General qualifies as invoking the process or not, or

15   whether it was sufficiently ambiguous that it was incumbent

16   to sort of ask.  And that's why I asked for the response.  I

17   didn't know if like DOE had written and said, "Hey, we're

18   confused," and the AG had wrote back and said, "No, we're not

19   asking for this about this," then that might be different.

20          MS. DRISCOLL:  Your Honor, the *American Career*

21   *Institute* case was a case like that, where the Department

22   determined that there should be a group discharge.

23          THE COURT:  Right.

24          MS. DRISCOLL:  And in that case, I think every

25   individual had signed something, said, "I'm relying on the

1  information that you're giving me."

2          MS. CONNOR:  That's not accurate.

3          MS. DRISCOLL:  Okay.  That was my understanding,

4  based on reading it.

5          MS. CONNOR:  But in any event, it doesn't mean that

6  they submitted individual borrower defense applications.

7  That decision to discharge those loans under borrower defense

8  was the result of a letter exactly like this one that the

9  Massachusetts Attorney General submitted to the Department of

10  Education.

11          Now, I don't know if that letter was submitted

12  pursuant to a common interest agreement, like this one was.

13  I don't know if there was follow-up back and forth.

14          THE COURT:  I'm not sure what to do with the common

15  interest agreement, because I haven't -- I'm not sure it's

16  before me.

17          MS. CONNOR:  It's not.

18          THE COURT:  I certainly haven't read it.  And so

19  the way that I'm thinking about this, I'm reading the AG's

20  letter on the four corners of the document, in light of the

21  regulations and the process.  And if there's some meaning

22  that I should ascribe to it in light of the common interest

23  agreement, then one of you would have to give me the common

24  interest agreement and explain to me why I should consider

25  it, how it bore on the meaning, and what -- I'm not saying

1    you have to give me, I have a lot of paper already.

2          MS. CONNOR:  I'm not privy to the common interest

3    agreement, either, other than the way it's been described in

4    the motion for a protective order before this Court.

5          MS. DRISCOLL:  Your Honor, the relevance of it,

6    from our perspective, is just the privacy of the documents

7    and the way that they were exchanged and obtained by the --

8          THE COURT:  So if neither of you think it bears on

9    how to interpret the document, if it just goes to sort of

10   confidentiality, which issues I think I've resolved, then I

11   don't see that it matters.

12         MS. CONNOR:  I think it could confirm that there

13   was -- what the understanding was, but I think that's already

14   clear in this record, that this was unambiguously a request

15   from the chief law enforcement officer of Massachusetts to

16   cancel all of these people's loans, including the plaintiffs.

17   And the plaintiffs were specifically identified therein.

18         And furthermore, I don't think it's accurate to say

19   that the letters --

20         THE COURT:  But here's the thing that I'm wondering

21   about that.  I could image the Attorney General writing a

22   letter to the Secretary of Education, that says, "Look, we've

23   investigated this school.  It's a really bad school, it's

24   done a lot of terrible things.  As a result of that, I think

25   you should cancel everybody's loans who went to that school."

1     It could be 100 pages of information about bad things the

2     school did, and it could just say cancel everybody's loans.

3     And that would be -- seems like it might be more on the

4     policy level.  And I don't know that -- if you're correct

5     about how to interpret legal enforceability in the statute,

6     then that it encompasses defenses, then you might be right.

7     But I confess that I'm not so sure.  I'm dubious that the

8     statute can be read quite that way.

9            And the -- and the letter, if you look at -- then

10    you think about the regulations, the regulations

11    contemplate -- I don't know that they're limited to

12    individual proceedings, but contemplate sort of some sort of

13    individual focus.  And I guess -- I could image the letter

14    being viewed more like this is a policy discussion, you

15    should just change the policy, and that's -- we're trying to

16    persuade you to do something.  As opposed to here, this

17    letter is more specific than the one I described.  But is it

18    more, like, you know, incumbent on them to view it as like an

19    individual proceeding or in some way respond on individual

20    relief?

21           MS. CONNOR:  I think it's -- I can't say, Your

22    Honor, that they have to, but they have in the past, in the

23    other example of ACI.  And here, given all of that context,

24    the Department has never said, "We are not accepting this."

25    And I think for that reason, they can't come in now and say,

"Well, we didn't consider that." There's no explanation of why not, and certainly that's news to the Massachusetts Attorney General, who, in their amicus brief, said they considered it to be pending and that they had had ongoing conversations and when they were asked for more information, they provided it.

The Secretary of Education came and held a press conference in Boston in March of 2016 and said, "We're still considering ways to give more relief to Corinthian students." They are having ongoing conversations. They get the judgement; they let the Department know about the judgment and the scope of restitution.

I don't think -- even as a member of the public, I think that they would be entitled to think that they, themselves, don't need to further exhaust, because the Attorney General has done it for them. I think it would be really unfair in this case, without some clear statement from the Department disabusing people of that notion.

THE COURT: So suppose I agree with you and thought that the Attorney General's filing was sufficient on behalf of these two plaintiffs to require the Secretary to consider all of that before she certified and that -- and suppose I concluded that she didn't do that, because she didn't include it in the record. And then what would be the relief that I would award?

1          MS. CONNOR:  Your Honor, you would vacate the

2    determination, which is a final agency action --

3          THE COURT:  And the certification.

4          MS. CONNOR:  -- and the certification, which

5    incorporates that determination in it, as well.

6          THE COURT:  So I vacate what?

7          MS. CONNOR:  Both the determination and the

8    certification.

9          THE COURT:  What's the determination?

10         MS. CONNOR:  The determination of legal

11    enforceability is referenced in the regulation as the final

12    agency action, and the certification is that the

13    determination took place.

14         THE COURT:  I see.  I vacate the two of those and

15    remand to the Department of Education to consider what to

16    do -- to consider all of this information and have further

17    proceedings and figure out how it should proceed, what it

18    should do about that and what its decision should be.

19         MS. CONNOR:  I think that the remand, since we have

20    a request for declaration that their debts are not legally

21    enforceable for purposes of offset, and given the position

22    that I understand the Department to have taken, which is that

23    even in an individual who committed a borrower defense

24    application within the window, if the Secretary hasn't

25    decided it's good or not before that window closes, there's

1    no bar to certification.

2           And with respect to Exhibit 3, their position is

3    that they accepted those as borrower defense applications,

4    but there is nothing that prevents them legally from using

5    involuntary collection against those people, even if their

6    applications are still pending.

7           So I think given this, we need the Court to say

8    that's not -- that's not accurate.  As long as these are

9    borrower defense applications, and they are, and they're

10   pending, you cannot collect this through involuntary --

11          THE COURT:  So what your saying I should do, if I

12   come to that conclusion, is vacate the certification and the

13   determination; remand for the Department of Education to

14   consider whether to certify or not, and include -- to reopen

15   the proceedings, including -- and including consideration of

16   everything the AG submitted in regard to these two people;

17   and prohibit them while they're considering it from

18   certifying as to these two people.

19          MS. CONNOR:  That's right.  And I think to clarify

20   what's arbitrary and capricious about the determination, it

21   seems to have been based on two precepts.  The first is that

22   was not a borrower defense application; and the second is

23   that even if it were, they could still certify.  Both of

24   those are wrong.

25          THE COURT:  I see.  Okay.  I understand.

1          So one other thing I wanted to ask you.  Suppose I
2     decided that the AG's letter didn't -- was just a general
3     letter.  And in that scenario, the one we've just described,
4     essentially the Government's exhaustion defense fails because
5     they did do something; they tried to exhaust, and they were
6     ignored would be one way to summarize that if I came to that
7     conclusion; and then I just remand it for consideration.
8          But suppose I decided that it didn't.  It was just
9     a letter from the AG.  There's certainly a difference between
10     Exhibit 3 and 4, in some way; that it didn't, and they
11     didn't -- and therefore, they didn't exhaust.  Because that's
12     they're only way to have exhausted, right?  These two
13     plaintiffs, they didn't do anything else to exhaust.
14          MS. CONNOR:  I think this is a final agency action
15     that's reviewable.
16          THE COURT:  Even if they didn't exhaust.
17          MS. CONNOR:  Yes.  And they have no way of
18     exhausting now, because the post-certification request for a
19     hearing or objection is entirely discretionary, and there's
20     evidence in the record that it's illusory, it doesn't happen.
21          And the position -- their position is you can
22     submit an objection in the form of a borrower defense, but
23     until --
24          THE COURT:  But couldn't they then claim that,
25     either here or in the court of claims, an illegal exaction?

1          I guess that's for Ms. Driscoll.

2          Let's say I agree with you, that the AG's letter is

3  not a defense to repayment, that they haven't exhausted, and

4  then there isn't evidence of exhaustion.  And say I agree

5  with you that they had to exhaust.  So their APA claim is

6  done.

7          Can they bring a claim here for -- under the Tucker

8  Act, that's less than $10,000 for the money seized, and say

9  it was an illegal exaction?

10         MS. DRISCOLL:  I --

11         THE COURT:  And if so -- well, first, could they?

12         MS. DRISCOLL:  There may be an exhaustion argument

13  in that case, as well.  The cases that we've cited on

14  exhaustion for TOPs, that don't deal with the APA, that are

15  brought -- and one is brought in a -- actually, three are in

16  FTCA cases, there are five criminal restitution cases, those

17  all require exhaustion, and they're not APA cases.  It's a

18  challenge to TOPs determination.

19         There are two student loan cases, neither of which

20  is brought under the APA, *Ogunmokun* and *Bowers.*  Both of them

21  are in our papers.  And they're offset challenges against

22  federally backed loan servicers where an exhaustion was

23  required.

24         So I don't know enough about how the illegal

25  exaction claim works, having just discovered it yesterday,

1    Your Honor --

2           THE COURT:  So you at least are reserving the right

3    that if that were the theory, that you could then assert the

4    exhaustion argument as to the monies already seized?

5           MS. DRISCOLL:  Yes, Your Honor, I would reserve.

6           THE COURT:  All right.  Okay.  I understand.

7           MS. DRISCOLL:  There's once case that's an APA

8    challenge to TOPs that's in our papers, *Spencer vs. GSA*,

9    District of New Jersey, 2015.  And it's not a student loan

10   case, but it's a claim under the APA against the GSA for

11   offset of the plaintiff's Social Security payments through

12   TOPs.  And it's post-*Darby*.  And the court dismissed because

13   the plaintiff didn't exhaust his remedies and request a

14   hearing before the agency in that case, *GSA*.

15          Those are different substantive regulations, but I

16   think the implication in all of the cases discussing

17   exhaustion under TOPs is that it's required.  *Darby* doesn't

18   preclude Your Honor from finding that exhaustion is required

19   under the TOPs program.

20          THE COURT:  But what if the arguments -- if I

21   accept your view of the statute, the arguments that they want

22   to make aren't really relevant to certification; they're

23   relevant to borrower defenses.

24          MS. DRISCOLL:  They want to make -- well, they're

25   trying to conflate the two.

1       THE COURT:  No, I understand.  But under your view

2   of the statute, I accept your view of the statute.  And I'm

3   dubious, to be perfectly frank, that this statute encompasses

4   causes of action, as opposed to bars.  But if I reach that

5   conclusion and agree with you on the statute, then the kinds

6   of defenses that they want to raise, the kinds of defenses

7   lots of people would raise, breach of contract, failure to

8   perform in contract cases because the statutes of general

9   application, it wasn't me, I'm not even -- the identity

10  theft, I wasn't the person, all of those kinds of things are

11  outside the scope of certification.  They're within the scope

12  of the regulations, but that's all discretionary of whether

13  the DOE provides relief or not.

14      Would that be -- in other words, would they be

15  relegated to -- would they have no -- how would they

16  vindicate that claim?

17      MS. DRISCOLL:  Your Honor, I still believe that

18  they have to present the claim to the agency.  Because even

19  though they are different theories, it is a defense that may

20  be asserted that will undermine what the Secretary considers

21  to be the legal enforceability of the debt.  That's their

22  argument, right?  This is a defense:  And my debt is not

23  legally enforceable, let me show you how.

24          So it's -- the Treasury regulations and the --

25          THE COURT:  But the how that the DOE has spelled

1 out is certainly broader than your interpretation of the

2 statute.

3    MS. DRISCOLL:  Yes.  Yes.

4    THE COURT:  And so does DOE have to consider those

5 things?

6    MS. DRISCOLL:  No.  Because it says a borrower may

7 assert.  At time of the certification, there's no affirmative

8 obligation on the Secretary to consider --

9    THE COURT:  No.  But if the borrower asserts it,

10 does DOE have to consider it?

11    MS. DRISCOLL:  If it's asserted, yes.

12    THE COURT:  Then what is the measure -- let's say a

13 borrower asserts a defense, and it's a cause of action under

14 state law, the kind of thing that would qualify.  And they've

15 put in -- how does the DOE make the determination?  What's

16 the criteria for deciding whether --

17    For example, I mean, obviously it's easy if they

18 don't put in any evidence or it's not provable.  But let's

19 say they put in reasonably sufficient evidence to show

20 whatever the nature of the claim is.  Why -- how does the DOE

21 decide whether that it should stay its hand or not?

22    MS. DRISCOLL:  There's a whole borrower defense

23 group that has been created over the last several years to

24 deal with these claims, and I don't know what the

25 administrative criteria are for assessing those claims.

1          THE COURT:  But it's not set forth in the

2    regulation.

3          MS. DRISCOLL:  No.

4          MS. CONNOR:  Your Honor, can I be helpful here?  I

5    don't think that we have to answer the question of whether

6    the loan will ultimately be discharged, to say that the

7    pending bar defense application is a bar to the collection of

8    the debt through Treasury offset.

9          THE COURT:  How?  Why?

10         MS. CONNOR:  Because those things are distinct.

11   Within the definition of legal enforceability in the Treasury

12   regulation, it says nothing about this determination says

13   anything about whether a debt is valid for other means of

14   collection.  What the Secretary has to do is say, "Could I

15   get a judgment on this?"

16         And really think about it this way:  Could the

17   Secretary come into court, and let's say the borrower appears

18   and says, "I'm going to raise this defense," whether it's

19   statute of limitations, whether it's something that goes to

20   the heart of the obligation that would extinguish it.  And

21   the Secretary -- the position, I think, is that the Secretary

22   could say, "I hear that defense, but a different courtroom

23   down the hall decides that defense.  And so I'm reviewing the

24   fact that you've made that defense, but because I haven't

25   determined down the hall that that's successful and I haven't

1    discharged your loan, I can use -- there's no bar for me

2    using offset."  That's their position.

3              MS. DRISCOLL:  And that's what the courts that have

4    reviewed the plaintiff's asserting statute of limitations

5    defenses to legal enforceability have found.

6              MS. CONNOR:  That's not true.

7              THE COURT:  So your position is that, if someone

8    comes in and asserts a borrower defense, (a), they can't

9    certify it until they adjudicate it.

10             MS. CONNOR:  They could not get a judgment until

11   that defense were adjudicated.

12             THE COURT:  And so therefore, while they're

13   thinking about whether they could -- while they're deciding

14   whether to evaluate it or not, they can't certify it.

15             MS. CONNOR:  Precisely.

16             THE COURT:  And so -- and they're -- what they have

17   to decide is, is this good enough to defeat us from getting a

18   judgment on the debt.  And if it is, then --

19             MS. CONNOR:  Honestly, Your Honor, I think at that

20   point, they can't certify the debt.  Whatever they want to

21   decide, if the person has established the right to discharge

22   their entire loan, that's fine.  But until they do that, they

23   can't use the Treasury offset.  The decision then, the

24   standards and how do they decide it, that's right, that's

25   over here.  That's different.  I mean, that's what this

borrower defense unit is doing.  It's just that they can't
say that there's no bar because they haven't decided over
here yet.

        THE COURT:  So you're saying that bar is bar to
winning, not bar to collection activity?

        MS. CONNOR:  I'm sorry?

        THE COURT:  You're saying the bar is a bar to
winning, as opposed to a bar to collection activity?

        MS. CONNOR:  Well, a bar to -- they can't get a
judgment without dealing with the defense, right?  So if a
defense has been asserted for purposes of TOP, could they go
into court and get a judgment?  Not without dealing with that
defense?  Have they dealt with that defense yet?  No.  They
can't get a judgment, they can't certify it.

        THE COURT:  What about the fact that, if they went
to court, they could get a judgment if the -- if the borrower
defendant didn't respond?

        MS. CONNOR:  Well, I think that's where the fact
that this is the government comes into play, and the statute
of limitations, for example, is a waiveable defense.  *Hurst*
says that the implication of it is that if it were outside
the statute of limitations -- we don't have a corollary here,
because there's no statute of limitations anymore on student
loans.  I don't think a Government can sue on a time-barred
debt; therefore, I don't think they can obtain a judgment on

1    a time-barred debt, regardless of whether, in some fictive

2    universe, the borrower would or would not come in and make

3    that affirmative defense.

4        MS. DRISCOLL:  Your Honor, I think that the fact

5    that you picked up on, that if the debtor could just not

6    appear in the state court action and the DOE could get a

7    judgment, that's the statute.  That's what the statute says,

8    no legal bars to collection.  And because it's the

9    government, even when the government receives a borrower

10   defense, it would not then certify it.  But there's nothing

11   that is preventing it from doing that in this statute or the

12   other regulations.

13       THE COURT:  So with respect to the AG's submission,

14   are you saying that I shouldn't treat it as a defense to

15   repayment, with respect to these two individuals who are on

16   Exhibit 4, simply because it didn't have the kind of

17   information that, when they read it, would cause them to

18   think it was a defense to repayment for those individuals?

19       MS. DRISCOLL:  Yes.

20       THE COURT:  Not something about -- or are you

21   making additional argument there's something about the role

22   of the Attorney General that also means that it's not?

23       MS. DRISCOLL:  Yes.  So Exhibit 3 are

24   individualized applications submitted by borrowers to the

25   Department of Education.  Exhibit 4 is list of borrowers who

1    attended the school.  They have not gone through the process

2    that all of the regulations require a borrower may assert, is

3    the borrower who has to assert the claim.  The fact that the

4    Department of Education has, as a matter of administrative

5    grace, granted group discharges before, does not entitle --

6              THE COURT:  That's all content.

7              MS. DRISCOLL:  Yes.

8              THE COURT:  Well, are you asserting that the people

9    on Exhibit 3 did make individual borrower defenses on their

10   own?

11             MS. DRISCOLL:  Yes.

12             THE COURT:  So the fact that -- so a third party

13   can actually communicate a defense to the Department of

14   Education on behalf of another person?

15             MS. DRISCOLL:  Well, it is sent by a third party,

16   but it's signed by the plaintiffs who are -- or by the

17   claimants, rather, who certify, "I am submitting this

18   attestation, additional materials in support of my

19   application for a borrower defense to repayment discharge of

20   my federal loans."

21             They are saying that themselves, they are providing

22   the information, they are signing it.  They're saying you can

23   release information to the Attorney General as part of it

24   this but --

25             THE COURT:  So there's no regulation that, first of

1    all prohibits, that defines or limits the kind of people who

2    can represent someone in a borrower defense application.

3            MS. DRISCOLL:  Your Honor noted last time that we

4    were here that an attorney could do so on a person's behalf.

5            THE COURT:  Well, I mean, in the ordinary course I

6    would assume so.

7            MS. DRISCOLL:  I would assume so, also.

8            THE COURT:  But I'm asking, do they have -- like,

9    from example, Social Security permits nonlawyers to represent

10   people in proceedings before Social Security.  I think

11   immigration court permits people who are nonlawyers to do

12   certain things on behalf of others, or they have some

13   certification or something, I'm not positive.

14           So I guess I'm wondering, do they have -- you're

15   not -- (a), do they have a regulation that defines who can

16   represent people?

17           MS. DRISCOLL:  Not that I know of.  They do have a

18   regulation that defines borrower or person who can assert the

19   debt, which I can find.

20           But for purposes of this application, I would argue

21   that if the Attorney General is acting as their lawyer,

22   they've explicitly said that in these defenses.  They're

23   signed and witnessed by the Attorney General's office,

24   privacy release, and third-party authorization --

25           THE COURT:  So what I'm trying to understand,

1    though -- well, first of all, it appears that DOE treated all

2    those as individual defenses and proceeded to process them.

3            MS. DRISCOLL:  Yes.

4            THE COURT:  That's what the affidavit says.

5            MS. DRISCOLL:  Yes.  That's the information that I

6    have.

7            THE COURT:  All right.  So the people on Exhibit 4,

8    what I'm trying to understand is, is the reason it's not a

9    defense to repayment because it's missing certain kinds of

10   information, so it doesn't -- it doesn't constitute or look

11   like a defense to repayment; or is it because it comes from a

12   third party; or is it -- or is it because it's not -- what if

13   it was signed?  I mean, is it the signature?  Is it the

14   absence of Social Security number?  Is the absence of -- is

15   it a *Harry Potter*-like chant?  It doesn't say, "I request a

16   defense to repayment"?  What is the --

17           MS. DRISCOLL:  It's, I would say, three things.

18   It's the content, it's the forum, and it's the fact that it's

19   not submitted individually by them.  And so those things

20   combined.

21           THE COURT:  So it bears no indicia -- they looked

22   at it and said it bears no indicia that that individual

23   person is making a request?

24           MS. DRISCOLL:  That's not in the record, Your

25   Honor, but I --

1        THE COURT:  That's the argument.

2        MS. DRISCOLL:  Yes.  Yes.  So there's not -- there

3   is a reference in the pleadings to -- or in the papers to

4   *parens patriae* standing for the AG's office, and that is to

5   file a civil action.  That is not to file an administrative

6   claim on the agency.

7        THE COURT:  And what authority says that they

8   can -- I guess I've looked at that, I was wondering about

9   that.  I'm glad you brought it up.

10       So what reason or what case or what regulation

11  distinguishes between those two contexts?

12       MS. DRISCOLL:  I don't have one.  I just know that

13  it says to file a civil action in the cited provision of

14  Chapter 93A.

15       THE COURT:  Well, under 93A, they have authority to

16  file civil action on behalf of anyone.

17       MS. DRISCOLL:  Right.

18       THE COURT:  And so why would that -- what -- why do

19  you -- so you interpret that language, since it doesn't say a

20  federal administrative action?

21       MS. DRISCOLL:  The point was that the plaintiffs

22  argue that that provision gives them authority to do this.

23  And my point, I think, was that it's well established that

24  the Massachusetts Attorney General can represent individuals

25  in the Commonwealth for purposes of filing a civil action

1    under 93A, but I have not seen any provision that allows her

2    to also, you know, file an administrative claim.  In these

3    cases I would argue --

4             THE COURT:  What reason would there be to either

5    say she could -- well, in your view, to say she couldn't?

6             MS. CONNOR:  Because she has.

7             MS. DRISCOLL:  Because she doesn't have the

8    statutory authority.

9             But in this case, where the plaintiffs in

10   Exhibit 3 --

11            THE COURT:  I'm not sure the Attorney General in

12   Massachusetts' authority is purely a creature of statute.  I

13   don't know.  I'd have to think about that.  I understand the

14   federal system, most people are creatures and their

15   authorities are creatures of statute, except certain

16   Constitutional officers.  But the AG is a Constitutional

17   officer under the Massachusetts system.  And if the federal

18   government doesn't have any rule, which it doesn't seem to,

19   about who can proceed in what way, then what the AG --

20            I mean, certainly if somebody were injured in an

21   accident and they were incompetent, a guardian, presumably

22   could proceed before DOE on their behalf, and *parens patriae*

23   authority would seem like that.  So I'm just wondering why --

24   you know, I understand that it doesn't say it in the statute,

25   but why should I read the statute so narrowly, or is there

1  any reason that would support that?

2        MS. DRISCOLL:  Well, I would argue that the

3  specifically signed forms that are in Exhibit 3, where the

4  borrower is specifically allowing the Department of Education

5  to work with the Massachusetts Attorney General's office

6  related to his or her application, show that there's some

7  kind of authority that needs to be given expressly in order

8  for her to do that.

9        MS. CONNOR:  That's as between the borrower and the

10  AG, not the borrower and the Department of Education.  It's a

11  release of information that I would have with a client to be

12  able to be a go-between.

13        Your Honor, this really narrow reading of the

14  regulation about a borrower may assert is a litigation

15  position.  It's not evident in the record.  We have a

16  declaration of a loan analyst saying we didn't consider there

17  to be a borrower defense on behalf of individuals in

18  Exhibit 4.  That person didn't make that decision.  We don't

19  know -- we just don't know.  We don't even know if that's

20  true.  We haven't had any evidence or discovery about that.

21        THE COURT:  Well, we know they didn't consider it

22  as a defense or repayment, because if they did, they would

23  have had to include it in the administrative record.

24        MS. CONNOR:  But we don't know why.  That's right,

25  Your Honor, but we don't know why, and it can't be because

the statute requires an individual to submit the application.
Because if that were true, then the Department could never
have granted all of the discharges to all of the borrowers
who attended ACI.  Same regulation, no individual
applications, group discharge, at the request of the
Massachusetts Attorney General, just like she requested here.

MS. DRISCOLL:  The fact that the Department of
Education exercises its discretion to award relief it's not
required to award, seems to be used against it in this case,
and I'm not sure why.  This is very clear that the
individuals are --

THE COURT:  Do you want me to explain to you why?

MS. DRISCOLL:  Sure.

THE COURT:  I think the reason would be because she
thinks it helps her position, and I think she thinks that
because they did it somewhere else, to the extent she thinks
it's either exactly analogous or at least somewhat analogous,
she thinks it advances her position.  So that's why.

Your position I think is you're saying no good deed
goes unpunished.

MS. DRISCOLL:  Right.

THE COURT:  But I think if you want to know why
she's doing it, I think that's why she's doing it.

MS. DRISCOLL:  Fair point, Your Honor.  And that's
between the Massachusetts Attorney General and the Department

1   of Education, and there's a lawsuit going on about that right
2   now in the District of D.C.
3           THE COURT:  About what?
4           MS. DRISCOLL:  The Massachusetts Attorney General,
5   the Illinois Attorney General, and the California Attorney
6   General, I believe, have all sued the Department of Education
7   relating to Corinthian students and the information that they
8   provided to the Department of Education, to resolve these
9   issues on a global level.
10          That's not these two plaintiffs.
11          MS. CONNOR:  Your Honor, just with respect to this
12  question of whether the regulation requires an individual
13  application, there's -- the evidence of the Department's
14  interpretation that it's not required with ACI.  There's also
15  its statement in the *Federal Register* explaining this
16  regulation in the 2016 regulation, that never went into
17  effect, saying, "We do not read the language 'a borrower' to
18  mean borrower in the singular or even to require an
19  application from a borrower."  So I don't think that that --
20  that's just not the way that they interpret the statute --
21  or, I'm sorry, the regulation.
22          THE COURT:  Okay.  Anything else either of you want
23  to say?
24          MS. DRISCOLL:  Your Honor, I wanted to add that
25  there's one more case that was similar to the *Spencer* case

that was not in my papers, and that's *O'Connell vs. Mills*
2014 Westlaw 354696, Eastern District of Michigan, 2014.

Like the *Spencer* case, that is an APA case
challenging TOPs.  The plaintiff -- the court found that the
plaintiff was not entitled to a tax offset refund and also
held that TOPs mandates exhaustion.  So this is post-*Darby*.
And in that case, the plaintiff didn't show that the SBA's
certification of his debt for collection was arbitrary,
capricious, or in violation of law.  And it -- it basically
impliedly holds like the other, like *Spencer*, that TOPs
certification is mandatory, so you have the authority to --
I'm sorry, TOPs exhaustion is mandatory, so you have the
authority to require exhaustion, notwithstanding *Darby*.

THE COURT:  And so your view would be, if they
didn't exhaust, I should dismiss.  Right?  Because they
didn't exhaust.

MS. DRISCOLL:  Right.

THE COURT:  And if I -- if they did exhaust -- if I
decided that the AG's letter was something that either
invoked the process or -- in some way -- then I should vacate
and remand for further proceedings.

MS. DRISCOLL:  We would take the position that
there's no jurisdiction under the APA because of the fact
that there's an adequate remedy in court, and that you can't
get money damages under the APA and you can't get an

1    injunction or any injunctive relief against the Secretary by

2    the limited waiver of sovereign immunity.

3            Alternatively --

4            THE COURT:  So if I decided that they exhausted,

5    that is, if I decided that the AG letter was a submission on

6    their behalf that requested some sort of process that they

7    had to consider, and that it plainly wasn't considered in

8    that fashion, that then -- what would I do?

9            MS. DRISCOLL:  So alternatively, if the Court were

10   to consider this under the APA, we would argue that the

11   plaintiffs did not exhaust.  And if you find that they did,

12   we would argue that the Secretary's certification of the

13   debt, at the time, in December 2015, was not arbitrary,

14   capricious, or a violation of law and to affirm that, based

15   on everything that --

16           THE COURT:  So you would say, if they did -- if I

17   treated the AG's letter as an exhaustion, then what you say I

18   should do is reach the merits of whether the decision was

19   arbitrary and capricious?

20           MS. DRISCOLL:  I believe that --

21           THE COURT:  I mean, I'm not conceding -- you're not

22   conceding your position about the AG's letter.  But I'm

23   saying that's a question that I have to decide.  If I decided

24   that the AG's letter invoked the process, and the --

25           Basically what I have before me, there's no way DOE

considered it, because it's not in the administrative record and because I have an affidavit from somebody that says they didn't, as an individual application.

So if I said they had to, then what you're saying I should do is proceed to then not do what plaintiffs' counsel says, which is vacate and remand; what you're saying I should do is then, nonetheless, proceed to the merits, and evaluate whether -- the merits being whether the decision is arbitrary and capricious.

MS. DRISCOLL: I would argue, Your Honor, that the decision is not arbitrary and capricious.

THE COURT: Right. But I would have to decide that. I should proceed to that.

MS. DRISCOLL: Right.

THE COURT: And then you would say it's not arbitrary and capricious, even in the face of all that information, for the same reasons, essentially, you say that it wasn't a submission. And you would say it is. But you would say don't vacate, decide.

MS. DRISCOLL: Yes, Your Honor. And if you are -- unless you believe that this was a valid claim before the Secretary, and then it's remand.

THE COURT: What do you mean?

MS. DRISCOLL: If this was a claim before the Secretary that you determine that the Secretary failed to

1    consider --

2              THE COURT:  Right.

3              MS. DRISCOLL:  -- then the remedy is --

4              THE COURT:  Right.  Isn't that the dispute about

5    the AG's letter?

6              MS. CONNOR:  Your Honor, if I can just clarify.  In

7    this colloquy, I think there's a confusion between exhaustion

8    and assertion of a defense.  So if we're talking about the

9    AG's letter, we're already talking about the merits of

10   whether it was arbitrary and capricious to certify that there

11   was no bar to collection.  There is no exhaustion requirement

12   here.  It's a final agency action, there is no exhaustion

13   requirement under the APA.  That's *Darby*.  There's no --

14   *Darby* says even if there's an optional right of further

15   review at the agency, you aren't precluded from coming into

16   court.

17             We're not precluded from coming into court for any

18   reason.  We could say you got the amount wrong, after they

19   certify.  We don't have to wait for the tax refund to be

20   taken to go and bring a Tucker Act claim for damages.

21             And in fact, the case that is cited, *Flanders*, it

22   articulates that.  There is a substantial -- a substantive

23   difference between a plaintiff seeking a return of money

24   already paid the government, and the plaintiff never having

25   to pay the money in the first place.  The APA is here to

1    prevent, to vacate the final agency action that's going to

2    lead to the paying of the money.

3              We're here; there is no exhaustion problem here.

4    The AG's letter goes to whether -- I think what you mean is

5    did they exhaust, did they alert, did they assert something

6    that would trigger --

7              THE COURT:  Consideration.

8              MS. CONNOR:  -- or preclude certification.  That's

9    right.

10             THE COURT:  So you're saying it triggered

11   consideration under borrower defense.

12             MS. CONNOR:  That's right.

13             THE COURT:  It was arbitrary and capricious to

14   certify without considering that.  They didn't consider that,

15   so vacate it and send it back for them to consider it and

16   decide whatever they're going to decide.

17             MS. CONNOR:  Right.  With some guidance.

18             THE COURT:  Yes.  I see.

19             And you're saying that they had to exhaust, even

20   with respect to the borrower defense.  And if I treat the AG

21   letter as invoking that process, don't vacate, but then

22   decide whether the decision to certify, even with this

23   information, was arbitrary and capricious.

24             MS. DRISCOLL:  I think you can decide that the

25   decision to certify was not arbitrary and capricious or a

1  violation of law.  If you are -- if you believe that the

2  Secretary needs further consideration of the information,

3  then --

4           THE COURT:  So even though the Secretary didn't

5  consider it in that context, you're saying go ahead and

6  decide it on the merits of arbitrary and capriciousness, if I

7  viewed it as invoking that process, and then just decide it

8  in the Secretary's favor.

9           MS. DRISCOLL:  Yes.

10          THE COURT:  But if I reach the merits and decide

11 that it's not in the Secretary's favor in the way that you

12 said it, I would say that it's arbitrary and capricious,

13 wouldn't I then be saying she can't certify it?

14          MS. DRISCOLL:  Then we would have to remand for

15 further agency consideration.

16          THE COURT:  Well --

17          MS. DRISCOLL:  There's no injunctive relief here.

18 You can't order her to not certify.

19          THE COURT:  I could say that she can't certify on

20 this record.  The certification on this record was illegal.

21 I could say that.  That's not an injunction.

22          MS. DRISCOLL:  Correct.

23          THE COURT:  And if I said that, that is what would

24 be the outcome, if I follow your invitation, if I get that

25 far.  Right?  In other words, I would decide the merits.  If

I decide the merits that on this record it can't be
certified, based on -- if I decide that it invoked a process
and you want me to decide it; and I decide it, and decide
that one way to decide it is it's not arbitrary and
capricious.  Because the other way is --

Because I think your sister would disagree with you
on that?  Am I right?

MS. CONNOR:  Uh-huh.

THE COURT:  And then if I decided that it was, I
would be deciding on this record, which is the administrative
record, plus the AG's filing, that with that information it
was arbitrary and capricious to certify it.  That wouldn't be
an injunction, it wouldn't violate the statute going forward;
but I think as a practical matter, my thought would be the
Secretary would have to tread very carefully in what she did
in the future with respect to that, to not run afoul of that,
absent an appeal.

Obviously further proceedings, in light of
different and new information, would be different.  But to
just get next year's thing and certify it next year, without
any particularly new information, that would be --
wouldn't -- that wouldn't be -- I mean, I would hear you as
to what would have to say about that, but I would think that
would be -- that would raise, at least in my mind -- I would
think about that.  Because that would seem to be contrary to

1    the judgment in this case, if that's the judgment I got to.

2           I'm just clarifying.  But that's what I should do,

3    I should reach those merits if I get that far.

4           And then you would want me to decide it the other

5    way, I shouldn't remand it.  Unless, in looking at it, I

6    decided it needed further consideration.

7           MS. DRISCOLL:  Yes, Your Honor.  The one thing that

8    we didn't cover, also, today was Taveras, and the fact that

9    her situation is different.

10          THE COURT:  So let me ask you one quick question

11   about that.  And none of you have waived anything by not

12   talking about it today.

13          But why isn't it -- I mean, as I understand, the

14   certification stands, but it's inactive.  But that --

15   since -- why isn't that ripe in the sense that, at any

16   moment, there's nothing that prevents the Secretary from

17   tomorrow --

18          It's partially inactive because of this case,

19   right?

20          MS. DRISCOLL:  Yes.

21          THE COURT:  So that can't --

22          MS. DRISCOLL:  Oh, no, I'm sorry.

23          THE COURT:  No, not because of this case.  Because

24   of the pending borrower defense that she filed.

25          MS. DRISCOLL:  Right.

1      THE COURT:  How long has that been pending?

2      MS. DRISCOLL:  Since right around the time that

3  this case was filed.

4      MS. CONNOR:  June 2016.

5      THE COURT:  June 2016.  So two years.

6      MS. DRISCOLL:  Yes.

7      THE COURT:  So I have to say, one thing that comes

8  to mind is the expression that one can be exhausted,

9  exhausting.  So even assuming that you're correct, that

10  exhaustion is required, in other context -- I haven't

11  considered this context, but I know in other context where

12  exhaustion is required, there are exceptions to the

13  exhaustion requirement when you can't get a decision.  You're

14  not required to wait forever.  And there's exceptions to

15  *habeas* proceedings for exhaustion, there's all sorts of

16  exceptions.

17      So what I'm wondering is, if it's been two years

18  and there hasn't been a ruling, and in a certain sense the

19  gun is to Taveras's head, in a sense that at any moment the

20  Secretary could decide to flick the with switch and make it

21  active, especially if it's grace and discretion, then why

22  shouldn't I -- even if exhaustion is required, why shouldn't

23  I -- why should I view that, given that duration, I guess, as

24  a bar -- as a ripeness issue?

25      MS. DRISCOLL:  Well, I think the Court should

follow the *Long vs. Rosenfelt* case from the Northern District
of California, 2017, directly on point.  And the court didn't
frame the issue in the terms of exhaustion, but in terms of
ripeness as to whether there's any live case or controversy
before the court.

So in this case, Taveras has received her refund,
so her past harm is moot.  She has been taken out of active
certification as a result of her borrower defense.  And
what's pending is before the agency.

And as the *Long* court found, if the agency affirms
her borrower defense claim, which we --

THE COURT:  She'll be happy.

MS. DRISCOLL:  The case before this Court will be
moot.  So the resolution of that determination will
significantly affect what's before the Court.

THE COURT:  But why isn't it -- like it is like a
weight.  If she's a wage earner, then she has to decide how
much to withhold.  And there are statutory requirements, I
think, about how much you withhold on your -- you know, when
you fill out the W-2 -- or is it the W-4?  So she's forced
into the position, essentially, of permitting the Government
to overcollect.  That's a function of the IRS statutes,
potentially.  That's presumably legal.  And so but that
leaves some pot of money there, and at any moment, the
Secretary can decide.  And under your view, she has to wait

1  until it's taken.

2       MS. DRISCOLL:  Well, the plaintiffs haven't argued

3  futility.  I thought they did in one of their briefs and I

4  responded to it, and they clarified it.

5       THE COURT:  I'm not sure it's a futility argument,

6  though.  To the extent it's ripeness, the question is whether

7  it's -- I guess I'm just wondering whether, you know, the --

8  like the Secretary hasn't decided in two years.  It's not

9  like they said, "We wanted to see what happens in this

10 litigation"; they haven't decided it because of the

11 application that's pending.  And so it seems that -- I mean,

12 there's some -- I understand what you're saying.  If she

13 wins -- if the Secretary ultimately decides to adjudicate it,

14 and adjudicates it in the plaintiff's favor, then she's

15 happy.  It's done.

16      MS. CONNOR:  Your Honor, it's just that in the

17 meantime, it's a violation of the law for her to remain

18 certified.  And that's what she's challenging.  She wants to

19 vacate the certification.  You're absolutely right.  It

20 couldn't be more ripe.  It's final.  She's certified.

21 There's a focal point for judicial review; she has a stake in

22 the outcome; she suffering injury, even if it's this fear

23 that you're describing, or not knowing should she file,

24 should she not file?  She files and she's owed an earned

25 income tax credit, is the grace going to disappear and it's

1    going to be seized?  I mean, it's ripe.

2          MS. DRISCOLL:  She's -- I mean, what I think she's

3    arguing is that there's a mandamus component to this that

4    we're trying to get the agency to act faster, and that's

5    not --

6          MS. CONNOR:  No.

7          THE COURT:  Well, the agency acted.  They

8    certified.

9          MS. CONNOR:  Exactly.

10          MS. DRISCOLL:  Right.  And they acted again and

11    removed her from active certification, pending the

12    resolution.

13          THE COURT:  It didn't vacate the certification.

14          MS. DRISCOLL:  That's not the process.  It's

15    certification, inactive or active, when a claim is filed.

16          THE COURT:  So an inactive one never goes to

17    Treasury, while its inactive.

18          MS. DRISCOLL:  That is my understanding.

19          THE COURT:  I'll think about it.  Okay.  I don't

20    know how significant that is.  It seems to me I have to

21    decide all the issues in the case, anyway, even if I agree

22    with you on that.  Right?

23          MS. DRISCOLL:  For the other plaintiff, certainly.

24          THE COURT:  Not to say it doesn't matter to her,

25    but it's not like -- it doesn't end the case, even if I -- I

1    don't know what -- I have to think about that.

2         All right.  This is --

3         I still don't understand, though, are you asserting

4    that the entire case is no jurisdiction under the

5    supplemental filing you made yesterday?

6         MS. DRISCOLL:  I think the argument is in the

7    alternative, Your Honor, which is there is an adequate remedy

8    for these two plaintiffs, who are not between certification

9    and offset of their refunds.  They've had their refunds

10   seized, and the process that has been set up at that point is

11   to file an illegal exaction claim under 31 USC 3720A.

12        THE COURT:  But they are between certification and

13   seizure as to their future refunds --

14        MS. CONNOR:  An illegal exaction claim cannot

15   vacate the certification.  We're here talking about vacating

16   the certification and the final determination of the

17   Secretary, that there's no bar to collection through offset.

18        MS. DRISCOLL:  There's a case called *Briggs*, which

19   is not in the papers, and it specifically discussed that

20   these claims belong under the Little Tucker Act.  And much

21   like Your Honor has said, when they determine that the debt

22   is not legally enforceable under the Little Tucker Act, that

23   the expectation is that the Secretary will then, or

24   whatever --

25        THE COURT:  But not legally enforceable under your

1   view of the statute is only that -- would either be a

2   determination that they certified a debt that wasn't past

3   due, or they certified a debt to which there's a bar for

4   collection.

5           MS. DRISCOLL:  Right.

6           THE COURT:  So if the person has one of these valid

7   other -- has one of these other defenses, borrower repayment,

8   that wouldn't give them relief under the illegal exaction,

9   because it was a properly -- if the review was just confined

10  to the statute of certification, and if I accept your

11  interpretation of the statute, they lose.

12          MS. DRISCOLL:  I think, if I recall correctly, the

13  issue in *Briggs* was actually identity theft.  And the court

14  said, "The APA waived sovereign immunity only if three

15  conditions are met:  The claims are not for money damages and

16  adequate remedy for the claims is not available elsewhere,

17  and the claims do not seek relief expressly or impliedly

18  forbidden by another statute."

19          And I would say here they -- in their complaint,

20  they seek an order directing the refunds, which is money

21  damages, effectively.  There is an adequate remedy at law

22  through 3720A, and the claims --

23          THE COURT:  How is it an adequate remedy?  Because

24  you're saying that they can -- that the borrower defenses can

25  be considered in an illegal exaction claim?  Is the

Government conceding that in an illegal exaction claim, that the court can consider defenses beyond those two things that make something certifiable under the statute, as the Government interprets the statute, that is, past due and no bar to collection?

MS. DRISCOLL:  I have not had time to study the cases, Your Honor, but my recollection is that at least some of them relate to identity theft.

THE COURT:  I guess my question, though, is this: For me to -- for it to be an adequate remedy at law, it seems to me that it would have to encompass the kinds of defenses that are borrower defenses they can assert.

MS. CONNOR:  I think I see what Your Honor's saying.  You're saying that her position, really, is that because of the existence of the Tucker Act, there's no waiver of sovereign immunity for this APA claim; but they have no claim for illegal exaction, either, because our APA theory fails.  Because the only thing that they can really argue about is really whether --

THE COURT:  I guess I'm wondering -- it seems to me -- I have doubts whether it's an adequate remedy at law if the only thing you can assert in the illegal exaction claim is whether it's past due or whether there's a bar to enforcement in the way the Government interprets the statute.

MS. CONNOR:  Exactly.

1          THE COURT:  And so if the Government's -- I

2    understand you want to look at it more, that's fine.

3          MS. DRISCOLL:  Yeah.

4          THE COURT:  But then I don't understand -- if it --

5    if the Government's position is, no, they're limited to that

6    there, to those two things, then you need to articulate to me

7    how it would be an adequate remedy at law.  And would you be

8    saying then that there's no judicial review ever -- I think

9    what you'd be saying is there's never any judicial review of

10   a borrower defense; that whether the Secretary gives relief

11   under the borrower defense as purely a matter of grace, the

12   Secretary could do it or not, and assuming that she wasn't

13   doing things in violation of some Constitutional or other

14   statutory provision, she could just do whatever she wants,

15   period, she could ignore some, not ignore others, she could

16   do what she wants, there's no review of that.  The only

17   review is --

18         Or you'd be saying, no, they can raise all those.

19   And obviously you have a stronger argument it's an adequate

20   remedy of law if you can raise all of those.  But you're not

21   sure which way you -- you're not willing to -- I'm not

22   faulting you for that, but like you haven't -- you're not

23   sure which way you want to go on that at the moment.  You

24   want to look at it longer.

25         MS. DRISCOLL:  Correct, Your Honor.  I will let you

1    know that my agency attorney is on vacation this week.

2              THE COURT:  Fine.

3              MS. DRISCOLL:  And I have not had the ability to --

4              THE COURT:  Here's what I'm going to do about that.

5    I'm, at the moment, not considering this alternative theory,

6    because it's not fully articulated.  And I'm not viewing it

7    as waived or anything like that.

8              If you want to press it, that's fine, you can press

9    it.  You're going away on vacation, don't interrupt your

10   vacation, that's fine.  I believe in vacation.  And when

11   you're back, your agency lawyer is back, you can talk about

12   it.  If you want decide you want to file something, you can.

13             If they do, I'll look at it, and you can file

14   something in response.  I'm not waiting for that.  If I --

15   I'm not saying that I'll have a decision before all of that,

16   but I'm not promising to wait.  We've had a long time and a

17   lot of briefing, and this isn't like a random case.  The

18   Department of Education, I presume -- you're the one who told

19   me, I think, that there's billions of dollars at stake in

20   this program, so I assume that DOE -- I would assume that

21   they've been carefully and in a nuanced way thinking about

22   all the issues and how to resolve them.  So I don't see any

23   reason at this stage of the proceedings to just sort of delay

24   it further.

25             On the other hand, if I rule, and then you look at

1  it and you decide that, based on however I rule, that there's

2  that issue, and it's a jurisdictional issue, you can raise it

3  then.  And I'll consider it and look at it.

4        And you'll get a chance to respond, and we'll see

5  what to do.

6        Anything else?

7        MS. CONNOR:  I agree with that course, Your Honor.

8  If you could just bear with a citation of one case that I

9  think is really helpful and could inform whether or not

10  additional briefing is needed on this.  There's a line of

11  cases, and the lead case is *Megapulse vs. Lewis*.  It's

12  672 F.2d 959.  It's a D.C. circuit case.  I have not found an

13  opinion applying this within the First Circuit, but every

14  other circuit does use this test.

15        And the test is designed to figure out whether an

16  APA case is actually a contract dispute in disguise and

17  mispled and actually within the exclusive jurisdiction of the

18  Tucker Act.  The test is two-pronged:  What's the source of

19  the rights at issue, and what's the nature of the relief

20  requested.  In both of those prongs it's clear that we're not

21  talking about a contract dispute.  Yes, we have an ancillary

22  claims to return the money, but that's pursuant to the

23  equitable injunctive relief under the APA that we're seeking.

24        THE COURT:  I see.  So you're saying your rights

25  arise under state law, and your relief is vacating the

administrative decision.

MS. CONNOR:  The relief is equitable.  There is nothing here that is causing the Court to apply federal common law of contracts.  We're not construing any term of a contract.  We're talking about statutory and regulatory schemes.  We've gone through --

THE COURT:  What you're saying is this isn't a breach of contract lawsuit between you and the Department -- your clients and the Department, in which you're trying to make an end-run and to avoid the court of claims over that.

MS. CONNOR:  Correct.  Correct.

THE COURT:  But I'm not quite clear what it matters, because I have concurrent jurisdiction over these plaintiffs anyway.

MS. DRISCOLL:  Right.

THE COURT:  So all it seems to matter would be -- and all of the arguments that, applicable under the APA, are arguably applicable under the Tucker Act, and the only thing that would really mean is pleading.  And it seems like I don't see why -- I haven't heard any reason why, if they -- if I thought it necessary for jurisdictional purposes they plead a different claim, why that would merit any reason for any additional briefing or why it would prejudice the defendants in any way.  So what would the --

In other words, so it may be, if that's what's

1    needed to be done, after looking at it, then fine.  But I

2    don't know how it would really materially change the course

3    of the proceedings.

4           MS. DRISCOLL:  I agree, Your Honor.  And when I am

5    back and my client's back, we'll confer; and if we need to

6    file something, we will.  But I agree, we've preserved the

7    defense, and your opinion will be your opinion.  Hopefully

8    we'll get something in before then.  And if not, if my client

9    feels strongly, we'll raise it after.

10           THE COURT:  Well, I'm not clear you've preserved

11    the defense, so we're clear.

12           My view of it is this:  You are entitled to file --

13    subject matter jurisdiction is in play at any point in time.

14    You are entitled.  I am not awaiting a filing from you.  You

15    can make a filing in the ordinary course when you do.  If

16    it's a subject matter jurisdiction and it's before my

17    decision, I'll consider it.  If it's after my decision and

18    it's in the form of I should vacate my decision because of

19    this subject matter, I will consider it.  And I'm not --

20           Given the ambiguity about what the Government's

21    potion is -- which I don't fault you for because this just

22    came up at the last minute.  But given the ambiguity of the

23    Government's position, I don't view it as fully raised

24    because I haven't heard you able to clearly articulate to me

25    what your position is as to why it's an adequate remedy of

1    law, clarifying some of these questions.

2            So I'm not saying -- whether it's actually

3    preserved or not is for a higher court to determine, if all

4    of you ever get there.  And I'm not taking a position on

5    that; That's for them to decide.

6            But I'm not addressing it in my decision at the

7    moment, given what -- the two feet I have of papers, because

8    I don't view it as clearly articulated what the Government's

9    position is, and I don't understand how it makes any

10   difference anyway.

11           Because what I understand you to be saying is that

12   when it's all said and done, I have jurisdiction, even if

13   you're right, and all the arguments are the same; and the

14   only thing that need be done is they would have to plead an

15   additional claim.

16           And I understand you to be saying that you're not

17   prejudiced if they do.  And other than explaining how it

18   should be under the Tucker Act instead, it doesn't -- you

19   don't need new discovery, you don't need to supplement the

20   record, you don't need -- your arguments are the same -- by

21   and large the same, and so it doesn't really seem to make

22   much difference.  So I'm proceeding.

23           And I don't see how it -- it seems to me, at most,

24   from what I understand now, it has, in the most technical

25   way, possibly bears on my jurisdiction, but only -- and if

1  they needed to plead a different claim.  But it wouldn't

2  matter if they did, for all those reasons that I've already

3  stated.  So that's my view of it.

4         All right.  Thank you very much.  I appreciate it.

5  It's very interesting.  You have a good day, a nice weekend,

6  and we're adjourned.

7         THE DEPUTY CLERK:  All rise, this matter is

8  adjourned.

9         (Court in recess at 11:58 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    **CERTIFICATE OF OFFICIAL REPORTER**

            I, Rachel M. Lopez, Certified Realtime Reporter, in

and for the United States District Court for the District of

Massachusetts, do hereby certify that pursuant to Section

753, Title 28, United States Code, the foregoing pages

are a true and correct transcript of the stenographically

reported proceedings held in the above-entitled matter and

that the transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.

                    Dated this 19th day of September, 2018.

                    /s/ RACHEL M. LOPEZ

                    _____
                    Rachel M. Lopez, CRR
                    Official Court Reporter