UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DARNELL E. WILLIAMS and YESSENIA M. TAVERAS,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH DEVOS,[1] in her official capacity as Secretary of the U.S. Department of Education,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 16-11949-LTS |

ORDER ON MOTIONS FOR JUDGMENT

October 24, 2018

SOROKIN, J.

This case alleges that the Secretary of Education ("the Secretary") improperly certified the student loan debts of plaintiffs Darnell Williams and Yessenia Taveras as legally enforceable for purposes of referral to the U.S. Department of the Treasury's Treasury Offset Program ("TOP"). Doc. No. 5. In January 2017, the Secretary moved to dismiss the case for lack of jurisdiction, arguing, inter alia, that the plaintiffs' claims are barred for failure to exhaust, and that Taveras's claims should be dismissed as unripe. Doc. Nos. 18, 19. Williams and Taveras opposed, Doc. No. 22, and the Attorney General of Massachusetts, Maura Healey, filed an amicus brief in support of the opposition, Doc. No. 29. The Court allowed the Secretary's motion insofar as the Amended Complaint, Doc. No. 5, sought injunctive relief or relief on behalf of persons other than Williams and Taveras and denied the motion in all other respects pending

---

[1] See Fed. R. Civ. P. 25(d) (providing for automatic substitution of successor to public official).

1

filing of the administrative record. Doc. No. 35. The Secretary filed the administrative record on

November 17, 2017. Doc. No. 43.[2] The plaintiffs subsequently filed a document from Attorney

General Healey that was in the Secretary's possession when she certified the plaintiffs' debts for

Treasury offset and moved to include it in the administrative record. Docs. No. 47-1, 46. Now

before the Court are the parties' cross-motions for judgment on the record. Doc. Nos. 67, 80.

I.      BACKGROUND

    A.      Facts[3]

The now-defunct Corinthian College was a large, for-profit company that formally

operated post-secondary schools around the country, including Everest Institute in Massachusetts

("Everest"). Doc. No. 81 at 4; 81 Fed. Reg. 39,330, 39,335 (June 16, 2016). According to

Attorney General Healey, between 2007 and 2015, Corinthian College ran Everest, offering

courses in medical administration, medical insurance billing and coding, dentistry, and massage

therapy. Doc. No. 47-1 at 3. Also according to Attorney General Healey, Corinthian marketed

Everest to individuals who were unable to afford its programs, and as a result, the vast majority

of students who attended Everest borrowed money from the federal government under Title IV

of the Higher Education Act of 1965 ("Title IV"). Id. As of June 30, 2010, 89.9 percent of

Corinthian's revenue came from Title IV loans. Id. at 4. In 2011, the Massachusetts Attorney

General's Office initiated an investigation of Corinthian's Everest campuses. Id.

Plaintiffs Williams and Taveras are two former Corinthian students. Williams attended

the Massage Therapy Program at Everest from March 29, 2011 to December 28, 2011. Doc. No.

_____

[2] The administrative record, Doc. No. 43, will be cited as "A.R.," using the page numbers
assigned by the agency that appear in the lower right-hand corner of each page.
[3] Except as noted otherwise, these facts are undisputed.

22-3 ¶ 3; Doc. No. 29-1 at 12; A.R. at 513.[4] Taveras enrolled in the Medical Assistant Program at Everest on October 28, 2010 and graduated on July 14, 2011. Doc. No. 29-1 at 12; Doc. No. 22-2 ¶ 3. To pay for their respective programs, Williams and Taveras each obtained nearly $10,000 in federal student loans through the Department of Education ("Education"). A.R. at 1-9, 509–11, 533–41; Doc. No. 19-2 ¶¶ 14–15.

Both plaintiffs defaulted on their student loans in the fall of 2014. A.R. at 488–89, 814–15. Both sets of loans were then transferred to the Education's debt collection unit that winter. A.R. at 509–11, 813–15. Then, in August 2015, Education sent each plaintiff an identical notice ("the notice") of its intent to refer their debts to the TOP. A.R. 490–95, 793–98; Doc. No. 19-2 ¶¶ 12, 17.[5] The notice stated:

> The U.S. Department of Education (ED) holds one or more past due, legally enforceable, defaulted student loans or grant claims for which you are responsible. . . . ED will refer your debt to the U.S. Department of the Treasury (Treasury), unless you pay this debt in full, make satisfactory arrangement to repay it, or make a timely, valid objection to enforcement of the debt. ED will request that Treasury deduct the amount of this debt . . . from any payment streams authorized by law . . . . These payment streams . . . include . . . Federal and/or State income tax refunds[.]

A.R. at 797.

The notice advised in bold, underlined text that "**Neither [Education] nor Treasury [would] provide an additional notice and opportunity to review records or to object to**

---

[4] There is some discrepancy in the record as to whether Williams graduated or withdrew from Everest. Compare A.R. at 513 (the Secretary's records listing Williams's "Withdrawal Date" as December 28, 2011), with Doc. No. 29-1 at 12 (the Massachusetts Attorney General's Office's records listing Williams's graduation date as December 28, 2011). Williams, by affidavit before this Court, has stated that he "graduated with a certificate in Massage Therapy in December 2011." Doc. No. 22-3 ¶ 3 (emphasis added).

[5] Through TOP, the Department of the Treasury ("Treasury") may collect a debt owed to an agency by reducing the amount of the debtor's tax refunds, if owed, by an amount equal to their debt and then paying that amount to the agency. See 31 U.S.C. § 3701(a)(1) (defining "administrative offset"); 31 C.F.R. § 285.2(a) (defining "tax refund offset").

**collection of [the] debt before a Treasury offset**." Id. (emphasis in original). The notices informed Williams and Taveras of their rights with respect to the proposed offset, including the rights to review documents, object to the amount or existence of the debt, seek review by Education of such objections, and have a lawyer represent them in exercising their rights. Id.

With respect to the right to object, the notices advised Williams and Taveras of various objections they could make, including:

1) "The debt is not past due at this time;"
2) "The debt is not legally enforceable against you at this time because, for example, you have filed bankruptcy and your case is still pending; the debt was discharged in a past bankruptcy; the loan was canceled for the death or disability;"
3) "The School owed you a refund for the period for which the loan was made, but did not pay the refund, or paid only part of the refund;" and
4) "The school you attended closed during the period for which the loan was made, or you did not have a high school diploma or GED and the school improperly determined that you could benefit from its training."

Id. This list identifies grounds that fall outside the scope of the Secretary's interpretation of "not legally enforceable," but does not specifically reference the "borrower defense" defined in 34 C.F.R. § 685.206(c), which is discussed further below. The objections listed are not defined as exclusive.

The notices admonished that "[t]o have [Education] review your objections to the collection of the debt(s), you must make a written request for review within 65 days of the date of the Debt Statement," id., but they also provided that a review of certification for offset could be obtained even if a person "miss[ed] the deadlines in [the] Notice," id. at 798. The notices did not elaborate on the circumstances under which Education would consider a late notice. However, the notices further stated that, once Education certifies a debt to Treasury for offset, Education will not withdraw that request, even if a defense to repayment is submitted, "until [the person objecting] prove[s] that the debt is not legally enforceable or not past-due." Id. The

notices additionally provided that, if a borrower presents written objections to repayment, Education will send "a written decision explaining whether [Education] will collect the debt in whole or in part, the reasons why, and the amount to be collected," and if the borrower disagrees with Education's decision, the borrower may have the "decision reviewed by bringing a lawsuit in Federal district court." Id.

Additionally, attached to each notice was a "Request for Review" form. Those forms stated: "If you object to offset against your . . . tax refunds . . . you can use this form[.]" Id. at 795. The forms included a list of objections to offset, advising the debtor to check "the objections that apply." Id. The list included the same objections described within the notices, as well as the following additional objections:

1) "I do not owe the full amount shown because I repaid some or all of this loan[;]"
2) "I am making payments on this loan as required under the repayment agreement I reached with the holder of the loan[;]"
3) "I am totally and permanently disabled[;]"
4) "This is not my Social Security Number, and I do not owe this loan[;]"
5) "I believe that [the school] without my permission signed my name on the loan application[;]" and
6) a catch-all, "I believe that this loan is not an enforceable debt[6] in the amount stated for the reason explained in the attached letter . . . (for example, the loan was

_____

[6] During the hearing, counsel for the Secretary urged the Court to construe a debt that is not "legally enforceable" for purposes of 31 C.F.R. § 285.2(d), which enumerates the criterion for referral of a debt to TOP, to include only those debts with *legal* bars to collection—i.e., bars to collection created by statute or Court stay. The meaning given to "not an enforceable debt" in the Secretary's form is broader than this construction. The sole specific example provided in the form of "not an enforceable debt" is "the loan was obtained by another person through the crime of theft of your identity," which is not a bar to collection created by statute, Court order, or regulation, but rather a defense that could be asserted in Court as a defense against repayment of a loan. More generally, the form invites objection based upon "any other reason not listed," a ground nowhere limited by the "legally enforceable" definition. The language in the Secretary's form is also different from that in her regulation, as the regulation refers to *legal* enforceability, see 31 C.F.R. § 285.2(d) (emphasis added), whereas the form refers only to enforceability more generally. For this reason, and the further reason that the catch-all also suggests identifying "any other reason," the Court construes the catch-all as encouraging the submission of objections such as a borrower defense rather than merely legal bars to collection.

obtained by another person through the crime of theft of your identity, or any
other reason not listed above).”

Id. at 795–96. The objections listed on the review form, like the objections recited in the notice of proposed offset, do not specifically reference the “borrower defense” defined in 34 C.F.R. § 685.206(c), although the form does include a catch-all category which suggests submitting “any other reason.”

The 65-day window to file a request for review, as described in the notices received by Williams and Taveras, expired in mid-October 2015. Neither filed an objection prior to the deadline. On November 30, 2015, after the 65-day window but before Education’s certification of the plaintiffs’ debts, Attorney General Healey wrote to the Secretary. Doc. No. 29 at 1. She had been investigating Corinthian for three years. Doc. No. 47-1 at 4. Based on the evidence gathered during the investigation, she found “Corinthian engaged in a pattern of unfair and deceptive conduct in violation of Massachusetts consumer protections laws,” and, on April 3, 2014, she filed a lawsuit against Corinthian in Suffolk Superior Court on behalf of all Everest students. Id. The action was stayed while Corinthian was in bankruptcy proceedings and so, at the time of Attorney General Healey’s writing to the Secretary, was still ongoing. Id.

In this writing to the Secretary, which Attorney General Healey calls a “defense to repayment” application (“the DTR”),[7] she requested “the immediate discharge” of federal student loans taken in connection with Everest, “full refunds to borrowers of amounts paid on the loans and the reversal of negative credit reporting.” Doc. No. 47-1 at 3. In support of her request, Attorney General Healey attached exhibits with information from former Everest students. Id. at

---

[7] The Court refers to Attorney General Healey’s writing using the name she gave the document in her amicus brief before the Court. See Doc. No. 29.

6. Among those are Exhibits 3 and 4, which are before the Court either under seal or in redacted form.

Exhibit 3 to the DTR is a collection of over 30 separate documents, each concerning one specific former Everest student. <u>See</u> Doc. No. 93.[8] These DTR forms submitted by Attorney General Healey were not completed versions of Education's request for review form attached to its notice of possible offset. However, the submitted forms did include, as to each student, dates of enrollment, contact and identifying information (including Social Security numbers), a list of deceptive practices of Everest with checkmarks next to those practices that influenced the specific student's decision to attend, and the student's signature. <u>Id.</u> They also included, as to each student, signed authorization for Attorney General Healey to access information regarding the status of the student's loan(s) and to act on the student's behalf. <u>Id.</u> Regarding the Exhibit 3 students, the DTR requested that Education "review [the] individual proffers [in Exhibit 3], as supplemented by [Attorney General Healey's] submission, and promptly discharge the applicants' federal student loans." Doc. No. 47-1 at 6. Exhibit 3 does not contain forms from Taveras or Williams.

Williams and Taveras appear in Exhibit 4, which contains information about an additional 7,200 Everest students in the form of a spreadsheet with a one-line entry for each student. Doc. No. 47-1 at 6, Doc. No. 29-1 at 12. Each entry includes the student's name, dates of enrollment, contact information, and programs attended. Doc. No. 29-1 at 12. The entries do not include the students' Social Security numbers, nor do they include statements from the students as to how they were personally influenced by Corinthian's illegal conduct. <u>Id.</u> Attorney

---

[8] Attorney General Healey provided Exhibit 3 to the Secretary pursuant to a Common Interest Agreement that prevented its disclosure. Doc. No. 93. Because Exhibit 3 is replete with former students' personally identifiable information, the Secretary filed it with the Court under seal. <u>Id.</u>

General Healey did not submit signed forms from the students that appear on Exhibit 4. Attorney General Healey requested in the DTR that Education "provide a swift, wholesale, and automatic discharge" of the federal student loans of all Everest students in Massachusetts (presumably a potentially larger group than the students listed on Exhibit 4), including the 7,200 students shown in Exhibit 4. Doc. No. 47-1 at 6. In a footnote, Attorney General Healey also stated:

> Given the enclosed evidence of widespread abuse, it is important that the Department of Education automatically discharge the loans of Corinthian's Massachusetts borrowers, and not require borrowers to submit individual applications. It is well beyond the resources of borrowers to investigate cohort placement rates or aggregate witness statements. Navigating defense to repayment applications and gathering associated required documentation can also present significant hurdles, particularly in the case of a closed school like Corinthian. If the Department cannot create an automatic discharge process, we urge the Department to put measures in place to assist borrowers in asserting their individual defense to repayment, as part of the debt collection process.

Id. at 6 n.5.

At the time Attorney General Healey submitted the DTR (and at the time the Secretary sent the notices to Williams and Taveras), the Secretary had a regulation providing that "in any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law," which "proceedings include . . . [t]ax refund offset proceedings." 34 C.F.R. § 685.206(c)(1). When a borrower defense claim is successful, the Secretary must "notif[y] the borrower that the borrower is relieved of the obligation to repay all or part of [her] loan[.]" Id. at § 685.206(c)(2).[9] The notices sent to Williams and Taveras did not refer to this regulation.

---

[9] The contracts that Williams and Taveras signed to receive federal student loans also provided: "[Y]ou [the borrower] may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done[.]" A.R. at 7.

In the DTR, Attorney General Healey cited specifically this regulation and asserted that relief was due under it for each of the three described categories of Everest students (students listed on Exhibit 3, students listed on Exhibit 4, and all students in Massachusetts) because Corinthian had violated Massachusetts consumer protection laws, thereby "providing Everest MA students with defenses to repayment of their student loans." Doc. No. 47-1 at 5. She then detailed—in a nearly 60-page discussion—the ways Corinthian had violated Massachusetts laws and deceived Everest students. See generally Doc. No. 47-1. For instance, according to the DTR, Corinthian misrepresented its in-field placement rates at Everest, which Corinthian advertised as "often in excess of 70%," id. at 3, when actual in-field placement rates were as low as 20 to 40 percent depending on the program, id. at 24. The document also described Corinthian's misrepresentation of the quality of career services and quality and type of classroom instruction at Everest. For example, in promotional material, Corinthian promised "programs specifically designed to provide hands-on training" but, in reality, most training at Everest was "self-taught instruction from workbooks." Id. at 35. And, although Corinthian promised "experienced instructors" with "industry-specific expertise," instructors were "unqualified, uninformed, and unconcerned with teaching." Id. at 38–39. "Many instructors were from temp agencies and some never taught in a classroom before." Id. In addition, Corinthian advertised its "professional-level standards for conduct and behavior" and "inspirational classroom discussions," but students instead found the school environment to be "a free-for-all," "unprofessional," and "neglectful." Id. at 40–41. Students reported "serious problems of drug use and violence" at Everest. Id. at 42. The document cited these practices and others as establishing violations of the Massachusetts Consumer Protection Act. Id. at 7.

On or about December 9, 2015, without having yet responded in writing to Attorney General Healey, the Secretary certified the plaintiffs' debts to Treasury for collection by offset. A.R. at 532, 833. The administrative record before the Court constitutes the entire record of the decision to certify the plaintiffs' debts for collection by Treasury offset. That record does not include any portion of the DTR, any reference to it, or any information provided in it. By affidavit, Education says it considered Exhibit 3—but not Exhibit 4—of the DTR "to constitute applications for Borrower Defense discharge." Doc. No. 55 ¶¶ 11–14.[10] Accordingly, "Education did not consider Plaintiffs Williams and Taveras as having applied for Borrower Defense discharge in connection with [the DTR.]" Id. ¶ 15. The administrative record includes no suggestion that the Secretary rendered a decision on the merits of the defense to repayment asserted by Attorney General Healey's letter on behalf of Williams and Taveras.

On January 8, 2016, Education responded to Attorney General Healey in a two-page letter, acknowledging receipt and careful review of the DTR and its attachments. Doc. No. 93-1. In the response, Education requested additional information about Corinthian's job placement rates and corroborating documentation of Corinthian's alleged misrepresentations in its advertising materials. Id. at 2–3. Education also affirmed its commitment "to providing a fair, transparent, and efficient process for debt relief for all students who believe they have been defrauded by their colleges" and its anticipation of "receipt of the [additional requested] information [from Attorney General Healey] . . . and . . . working with [Attorney General Healey] for the benefit of Massachusetts students." Id. at 3. Education, in this response, did not address whether it viewed the DTR as a request for review or borrower defense under 34 C.F.R.

---

[10] Education has indicated that at least one student whose information appeared in Exhibit 3 of the DTR has received the requested relief. Doc. No. 55 ¶ 17.

§ 685.206(c) on behalf of the students named in Exhibits 3 or 4 of the DTR, nor did it request clarification. Nowhere in the response letter did Education reject or even acknowledge Attorney General Healey's request that Education discharge the Corinthian loan debts of the students listed on Exhibit 4 without requiring each student to initiate personally a borrower defense to repayment proceeding complete with individual submission of evidence.

Without further correspondence with Attorney General Healey,[11] on April 27, 2016, Education seized Williams's tax refund in an amount of $1,263, A.R. at 523, and, on May 25, 2016, it seized Taveras's tax refund in an amount of $4,999, A.R. at 818–19.[12]

On June 3, 2016, after the Secretary certified Taveras's debt for collection by offset, Taveras personally submitted a borrower defense claim. A.R. at 834–38; Doc. No. 19-2 ¶ 20. Following this submission, on October 26, 2016, the Secretary suspended collection actions on Taveras's debt. Doc. No. 19-2 ¶ 20. Taveras's debt remains certified and, more than two years post-submission, her borrower defense claim remains pending. Doc. No. 19-4 at 28. The record is devoid of anything suggesting either that Education has taken any action toward deciding Taveras's claim or that there is a predictable timeline for when a decision will be rendered.

In June 2016, in the lawsuit Attorney General Healey brought on behalf of all Everest students, the Suffolk Superior Court issued a judgment against Corinthian. In August 2016, it ordered restitution in an amount of $67,333,091—equal to "the total of all monies acquired by

---

[11] The Court ordered the Secretary to file "<u>any responses</u> to [Attorney General Healey's] letter by Defendant." Doc. No. 89 (emphasis added). She filed only the January 8, 2016 letter. <u>See</u> Doc. No. 93.

[12] Taveras filed her taxes jointly with her spouse; the tax refund seized was her joint tax refund. Doc. No. 19-1 ¶ 8. Because the Internal Revenue Service found Taveras's husband was an "injured spouse" entitled to "innocent spouse" relief, <u>see</u> 26 U.S.C. § 6015, in October 2016, Treasury returned the full amount of the seized refund to Taveras and her husband. A.R. at 818-19, 821.

[Corinthian] from graduates enrolling in [Everest] during the period July 1, 2006 through June 30, 2014." Doc. No. 29-1 at 2, 10.

B. <u>The Regulatory Scheme</u>

When a person defaults on a loan owed to a federal agency, United States law permits collection of that debt through a variety of means, including tax refund offset. 31 U.S.C. § 3720A(a). Collection by offset is conducted through TOP. 31 C.F.R. § 285.5. An agency that is owed a debt may refer a "past-due, legally enforceable debt" to TOP. 31 U.S.C. § 3720A(a). Upon receiving such a referral, the Secretary of the Treasury reduces the amount of the defaulter's tax refund, if owed, by an amount equal to his debt. <u>Id.</u> at 3720A(c). The Secretary of the Treasury then pays that amount to the referring agency. <u>Id.</u>

Treasury has established regulations that govern what must be done before a debt may be referred to TOP. Before an agency may refer a debt, the agency must, <u>inter alia</u>: (1) notify the person incurring the debt of the agency's intent to collect the debt by tax refund offset; (2) allow the person an opportunity for a review of the agency decision to certify the debt; (3) allow the person to present evidence that the debt is not past due or not legally enforceable; (4) consider "<u>any</u> evidence presented by [the] person;" and (5) determine that the debt is past due and legally enforceable. 31 U.S.C. §§ 3716(a)(3), 3720A(b); 31 C.F.R. § 285.2(b)–(d) (emphasis added). For the purposes of TOP, Treasury has defined "past due" and "legally enforceable" narrowly. A debt that is "past due" is one that "has not been paid by the date specified in the agency's initial written demand for payment, or applicable agreement or instrument[,]" and a debt is "legally enforceable" when "there has been a final agency determination that the debt, in the amount stated, is due, and there are no legal bars to collection by offset." 31 C.F.R. § 285.5(b). The regulation does not define "legal bar" but states that such debts "include, but are not limited to,

debts subject to the automatic stay in bankruptcy proceedings or debts covered by a statute that prohibits collection of such debt by offset." Id.

Treasury's regulations do not limit an agency from considering other defenses to collection prior to certification. In fact, Congress has required the Secretary, "[n]otwithstanding any other provision of Federal or State law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan." 20 U.S.C. § 1087e(h). The Secretary's regulation providing for the assertion in tax refund offset proceedings of "any act or omission of the school . . . that would give rise to a cause of action against the school under applicable State law," 34 C.F.R. § 685.206(c)(1), was issued pursuant to this statutory duty.[13]

Another set of regulations more specifically governs collection by tax refund offset of debt owed to Education. 34 C.F.R. §§ 30.24, 30.33. The Secretary's regulations require that she allow a debtor 65 days from the date notice is provided to the debtor of the Secretary's intent to collect by offset to request a review by Education of the existence, amount, enforceability, or past-due status of the debt. 34 C.F.R. § 30.33. Per the Secretary's regulations, a request for review must identify "the debtor and the particular debt, including the debtor's Social Security number and the program under which the debt arose" as well as an "explanation of the reasons the debtor believes that the notice the debtor received . . . inaccurately states any facts or conclusions relating to the debt." 34 C.F.R. § 30.24(a)–(b). Once a request for review is submitted, the Secretary, must "[r]eview[] the documents submitted by the debtor and other

---

[13] The Secretary's regulations also provide grounds for discharge of a loan obligation, including death, total and permanent disability, bankruptcy, closed school, false certification, unpaid refunds, participation in loan forgiveness program, and September 11 survivor discharge. 34 C.F.R. § 685.212.

relevant evidence" and then "[n]otif[y] the debtor in writing of [her] decision regarding the issues identified . . . and, if appropriate, the question of waiver of the debt." Id. at § 30.24(e). Although the Secretary's own regulations provide that a debtor, who does not otherwise have a request pending with Education, "must file a request for review by . . . [s]ixty five days after the date of the notice[,]" 34 C.F.R. § 30.33(d)(1), the notice that a debtor receives of impending offset states: "You [the debtor] may obtain documents, a review, or a hearing . . . even if you miss the deadlines in this notice." A.R. at 798. At the July 27, 2018, hearing, counsel for the Secretary affirmed that it is Education's practice to consider requests for review submitted after the 65-day window. Doc. No. 97 at 9–10.

## II.    LEGAL STANDARD

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." Boston Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). This standard of review is "a narrow one," Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989), and a "court is not to substitute its judgment for that of the agency," Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "Because the [Administrative Procedure Act ("APA")] standard affords great deference to agency decisionmaking and because [agency] action is presumed valid, judicial review, even at the summary judgment stage, is narrow." Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). Nevertheless, courts should not automatically defer to an agency without "carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision." Marsh, 490 U.S. at 378.

III.     DISCUSSION

A.     Ripeness and Mootness

The Secretary argues, as to Taveras only, that her claim is moot because her tax refund was returned, for reasons unrelated to the litigation, and her debt is no longer in active collection because of her pending borrower defense application. In the alternative, the Secretary argues that Taveras's claim is not yet ripe because she has a pending borrower defense which has not yet been adjudicated.

Taveras's claim is not moot. The Secretary acknowledges that "[w]hen Education receives a borrower defense to the collection of a loan through TOP, it *chooses* to remove the loan from 'active' certification . . . . But this practice, which is not mandated by any statute or regulation, is purely a matter of administrative discretion." Doc. No. 87 at 5. The notice that Taveras received explained:

> You may obtain documents, a review, or a hearing . . . even if you miss the deadlines in this notice. However, if [Education] has already requested Treasury to offset your Federal and/or State tax refunds and other payments, [Education] will not withdraw the request until you prove that the debt was not legally enforceable or not past-due.

A.R. at 495, 798. Accordingly, although Taveras's debt is currently "inactive," the debt remains certified. A.R. at 827. It is the certification decision that Taveras has challenged, and the relief she seeks is the Court's declaration that the agency's decision in the face of the DTR violated the APA. That challenge is not moot because the relief she seeks remains available. See Campbell Ewald Co. v. Gomez, 136 S. Ct. 663, 669 (2016), as revised (Feb. 9, 2016) ("A case becomes moot . . . only when it is impossible for a court to grant any effectual relief to the prevailing party."). Furthermore, Taveras challenges the Secretary's failure to consider the DTR in certifying Taveras's debt for collection. The Secretary has indicated that she did not consider the

DTR in certifying Taveras's debt and has submitted nothing suggesting that she will consider it in evaluating Taveras's borrower defense submission.

Taveras's claim is also ripe. "[R]ipeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990). The agency decision to certify Taveras's debt for offset represents a final agency decision and is therefore fit for judicial review without further factual development. See W.R. Grace & Co. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992) ("Under the 'fitness for review' [ripeness] inquiry, we consider . . . the degree to which any challenged agency action is final."). Furthermore, withholding court consideration represents a present hardship for Taveras. Her claim does not allege harm that is "wholly contingent," W.R. Grace & Co., 959 F.2d at 367, because her debt was certified for offset and remains certified. Although Taveras has an outstanding borrower defense application pending, the application has not been acted upon since its filing two years ago. The Secretary has indicated no timeline for when the application will be acted upon and, under her regulations, may even ultimately decline to review Taveras's defense because of its late filing.[14] "[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." Envtl. Def. Fund, Inc. v. Hardin, 428 F.2d 1093, 1099 (D.C. Cir. 1970); see also 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure §

---

[14] Although the Secretary argues that a debtor may challenge certification at any time—even after certification—she cites to no statute or regulation supporting her assertion. Doc. No. 87 at 3. Instead, she cites the language of the notice that Williams and Taveras received prior to certification of their debts. See id. (quoting A.R. at 798). Under her regulation, the Secretary "may decline to provide an opportunity for review." 34 C.F.R. § 30.24(c) (emphasis added).

3532.6, at 635 (3d ed. 2008) ("Protracted failure to act also may be subject to review in order to determine whether action has been wrongfully withheld."). Taveras's challenge is therefore ripe.[15]

B.     Exhaustion

The parties dispute whether exhaustion of Education's review process is required before a borrower may challenge the Secretary's certification decision in court. The Secretary argues that plaintiffs did not "pursue[] their available administrative remedies to object to the collection of their debts through offset, or commence[] the borrower defense process," Doc. No. 81 at 8, which she argues is a prerequisite to maintaining suit in a district court, Doc. No. 87 at 1-2. Williams and Taveras deny that any exhaustion requirement applies. Doc. No. 84 at 3.

The purpose of an exhaustion requirement is "to ensure that the agency have additional opportunities to discover and correct its own errors, and thus . . . to obviate all occasion for judicial review." McGee v. United States, 402 U.S. 479, 484 (1971) (internal quotations omitted). Such a requirement "afford[s] the parties the full benefit of the agency's expertise and allowing the agency the first opportunity to correct its own bevues." Mazariegos-Paiz v. Holder, 734 F.3d 57, 63 (1st Cir. 2013). "Although exhaustion of administrative remedies is absolutely required if explicitly mandated by Congress, courts have more latitude in dealing with

---

[15] The Secretary also claims that the Court lacks subject matter jurisdiction to consider the plaintiffs' claim under the APA because the availability of a remedy under the Little Tucker Act, 28 U.S.C. § 1346(a), precludes the application of the APA, see 5 U.S.C. § 704 (allowing judicial review of agency action "for which there is no other adequate remedy in a court"), and because claims for money damages are not allowed under the APA, 5 U.S.C. § 702 (waiving sovereign immunity for claims "seeking relief other than money damages"). However, the plaintiffs' claim is not for money damages. Rather, Williams and Taveras challenge the Secretary's failure to consider the DTR in her decision to certify the plaintiffs' debts for Treasury offset, seeking as a remedy only to vacate her decision, not money damages. Accordingly, the Little Tucker Act does not apply, and subject matter jurisdiction exists under the APA.

exhaustion questions when Congress has remained silent," and in such cases, "the court of first instance possesses a modicum of discretion to relax the exhaustion requirement." Portela-Gonzalez v. Sec'y of the Navy, 109 F.3d 74, 77 (1st Cir. 1997). The Supreme Court has identified "three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion": first, where "unreasonable or indefinite delay threatens unduly to prejudice the subsequent bringing of a judicial action"; second, where "substantial doubt exists about whether the agency is empowered to grant meaningful redress"; and finally, "where there are clear, objectively verifiable indicia of administrative taint." Portela-Gonzalez, 109 F.3d at 77 (quoting McCarthy v. Madigan, 503 U.S. 140, 145–46 (1992)). But where "a claim arises under the APA, courts may not exercise their judicial discretion to require exhaustion of administrative remedies if the statute and agency rules do not otherwise require exhaustion." Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 36 (1st Cir. 1998) (citing Darby v. Cisneros, 509 U.S. 137, 153–54 (1993)).

With respect to the plaintiffs' APA claim, the Secretary argues that her certification decision is "not a *reviewable* final agency action" because it "is subject to administrative process" that the plaintiffs have failed to exhaust. Doc. No. 87 at 4 (emphasis in original). But the APA creates no subcategory of "*reviewable* final agency action[s]" within final agency actions—rather, it requires exhaustion of administrative remedies before judicial review of final agency action only where exhaustion is otherwise explicitly required by statute or rule. 5 U.S.C. § 704; see also Darby, 509 U.S. at 146 ("limit[ing]," in the APA context, "the availability of the doctrine of exhaustion of administrative remedies to that [application] which the statute or rule

clearly mandates").[16] Here, no statute or regulation required the plaintiffs to exhaust

administrative remedies before bringing an action for judicial review. Although the Secretary

advances several cases that imposed an exhaustion requirement in actions to challenge debt

collection through Treasury offset, Doc. No. 26 at 3–4, Doc. No. 87 at 1–2, each is inapposite

because none involved an APA challenge to final agency action.[17] Even if courts may impose an

exhaustion requirement in similar circumstances arising in a different context, they "may not

make the exhaustion of further avenues of administrative relief that the agency may make

available a precondition to securing judicial relief under the APA." Glob. Tower Assets, LLC v.

Town of Rome, 810 F.3d 77, 84 (1st Cir. 2016). Accordingly, the Court finds that plaintiffs are

---

[16] To the extent that the Secretary means to argue that her certification decision was not a final agency action at all, this argument plainly fails. "[F]inality 'is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury.'" Berkshire Envtl. Action Team, Inc. v. Tennessee Gas Pipeline Co., LLC, 851 F.3d 105, 110–11 (1st Cir. 2017) (quoting Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193 (1985)). "Agency action is considered final when it represents the culmination of the agency's decisionmaking process and conclusively determines the rights and obligations of the parties with respect to the matters at issue." Rhode Island v. E.P.A., 378 F.3d 19, 23 (1st Cir. 2004). The Secretary concedes that "there is no question [she] made a 'final determination' when she certified" the plaintiffs' debts for offset. Doc. No. 87 at 4. She thereby reached "the culmination of [her] decisionmaking process," and her decision "conclusively determine[d]" whether the plaintiffs' debts would be collected through offset, Rhode Island, 378 F.3d at 23. Her certification decision was therefore final agency action within the meaning of § 704.

[17] Of the nine district-court cases cited by the Secretary in her briefing, eight did not involve APA claims, and neither party to the ninth case, Spencer v. Gen. Servs. Admin., Civ. No. 15-4813-JLL, 2015 WL 5565812 (D.N.J. Sept. 21, 2015), argued that the challenged agency action was final. At the July 27, 2018, hearing, counsel for the Secretary advanced a tenth district-court case, but the plaintiff in that case did not "even mention the APA as a possible source of . . . jurisdiction," nor did he offer "any documentary evidence of a final agency decision." O'Connell v. Mills, No. 13-15124, 2014 WL 354696, at *4 (E.D. Mich. Jan. 31, 2014).

entitled to advance their APA action to have the agency's decision reviewed on the basis of the administrative record without first exhausting available administrative remedies.[18]

Even if Williams and Taveras had been required to exhaust, the Court finds that any such requirement would have been satisfied by Attorney General Healey's DTR submission to Education, which invoked the administrative remedy of Education's review process such that Education was required to adjudicate the request, and the Secretary's subsequent decision to certify the plaintiffs' debts for collection through offset. In the First Circuit, "an issue is exhausted when it has been squarely presented to and squarely addressed by the agency, regardless of which party raised the issue (or, indeed, even if the agency raised it sua sponte)." Mazariegos-Paiz, 734 F.3d at 63. Plaintiffs argue that Attorney General Healey's DTR submission to Education constituted a borrower defense application that was pending before the Secretary at the time of her certification decision. Doc. No. 84 at 6. The Court agrees. The DTR submission presented to the Secretary the issue of whether the plaintiffs' borrower defense precluded the Secretary's certification of their debts for offset, and the Secretary's subsequent decision to certify the plaintiffs' debts, despite having received the DTR submission, had the substantive effect of determining that the plaintiffs' borrower defense did not prevent certification. In this circumstance, where the Secretary received the DTR submission before her certification and her decision to certify the plaintiffs' debts for offset necessarily rejected any borrower defense the submission presented, her decision "squarely addressed" the issue of the

---

[18] Because no exhaustion requirement applies to the plaintiffs' APA claim, the Court finds no justification to impose an exhaustion requirement on their claim under the Declaratory Judgment Act ("DJA") in the absence of a statute or rule that explicitly imposes one. Because the Court must evaluate the plaintiffs' APA claim, requiring exhaustion on the DJA claim necessarily cannot "obviate all occasion for judicial review" of the Secretary's decision, as the exhaustion doctrine is intended to do. McGee, 402 U.S. at 484. Rather, such a requirement could only lead to "unreasonable . . . delay." Portela-Gonzalez, 109 F.3d at 77.

plaintiffs' borrower defense and satisfied any requirement to exhaust. <u>Mazariegos-Paiz</u>, 734 F.3d at 63.

The Secretary objects that Attorney General Healey's DTR did not suffice as an application to commence the borrower defense process because the applicable regulation "makes no provision for a *third party* to assert the borrower defense or for defenses to be submitted on behalf of a group of borrowers," Doc. No. 81 at 13 (emphasis in original), and she argues on this basis that the plaintiffs did not exhaust available administrative remedies, <u>id.</u> at 8. While a request for borrower defense might come in a variety of forms (e.g., Education's suggested form, Attorney General Healey's form appearing in Exhibit 3, or a client engagement letter), the Secretary argues that DTR delivered no such specific request as to Williams, Taveras, or the other students listed on Exhibit 4. Doc. No. 81 at 15.

To the extent the Secretary means to argue that Attorney General Healey can never represent her citizens in administrative proceedings, she is plainly wrong, as established by Education's own documents and black-letter law. The Attorney General is a lawyer, licensed to "seek the lawful objectives of [those whom she represents] through reasonably available means permitted by law," including through recourse to administrative proceedings. Mass. R. Prof'l Conduct 1.2; <u>see</u> Mass. Gen. Laws ch. 12, § 1 (requiring state bar membership for position of Massachusetts Attorney General). Indeed, in the case Attorney General Healey brought against Corinthian in Suffolk Superior Court, she obtained $67,333,091 in restitution to "restor[e] these consumers," enrollees in certain programs at Corinthian's Everest Brighton and Everest Chelsea

campuses, "to the position they were in prior to the unfair or deceptive acts or practices." Doc. No. 29-1 at 8, 10.[19]

The Secretary nevertheless argues that federal law allows only the borrower herself to make an individual application for borrower defense. Doc. No. 81 at 13–14. The Court finds no basis in the law for applying such a requirement. The notice to the each of the plaintiffs of their right to object to the certification of their debts for offset acknowledges that they could "[h]ave a lawyer represent [them] in exercising" their right to have Education review any objections to their debt or its collection by offset. A.R. at 797. The Secretary has cited no statute or regulation that explicitly prohibits an attorney general from asserting a borrower defense request on behalf of her citizens. Further, attorneys general regularly act to protect particular interests of individual citizens. See Sec'y of Admin. & Fin. v. Attorney Gen., 326 N.E.2d 334, 338 (Mass. 1975) ("The Attorney General . . . has a common law duty to represent the public interest."); cf. Fla. ex rel. Shevin v. Exxon Corp., 526 F.2d 266, 270 (5th Cir. 1976) (recognizing the Florida Attorney General's common-law authority to institute an action under federal law to recover damages

---

[19] To the extent the Secretary means that Attorney General Healey is a public lawyer and, unlike an ordinary "private" lawyer, may not represent individuals, the Secretary has cited no Massachusetts or federal law so limiting Attorney General Healey's authority. In fact, state law is to the contrary. Attorney General Healey has general state statutory authority to represent her citizens in actions enforcing the Commonwealth's consumer protection laws, Mass. Gen. Laws ch. 93A, § 4, and *parens patriae* standing to guard "the well-being of [her] populace," Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 602 (1982). For example, in cases of state wage law violations, the Attorney General can issue citations that require the payment of unpaid wages directly to the affected Massachusetts workers. See Mass. Gen. Laws ch. 149, §§ 2, 150; Melia v. Zenhire, Inc., 967 N.E.2d 580, 589 (Mass. 2012) ("the Attorney General always retains the power to enforce the Wage Act in Massachusetts"). Moreover, she is particularly competent to represent citizens of Massachusetts in defense to repayment proceedings because of her expertise in her state's consumer protection laws. See Mass. Gen. Laws ch. 93A, §§ 2, 4 (vesting the Attorney General with the authority to interpret Massachusetts' consumer protection statute). Further, an Education official has attested that Education accepted the DTR as initiating an individual proceeding on behalf of each person listed in Exhibit 3. Doc. No. 55 ¶ 13.

without express consent from the damaged parties). In this way, Attorney General Healey stands in very different shoes than a private lawyer seeking relief on behalf of a class of individuals whose interests the private lawyer does not, by virtue of public office, routinely and presumptively represent (and who fairly could be required to support his submission with individual requests from each borrower for whom he purports to speak). Absent a clear and explicit law or regulation prohibiting attorneys general from proceeding in this context as they inarguably can and regularly do elsewhere, the Court is persuaded that Attorney General Healey can advocate on behalf of citizens she believes have been harmed, as she has done here.

In its response to Attorney General Healey's letter, Education did not advance the position that the law (or anything else) required an individual request from each borrower. The language of the DTR submission itself requested the application of the borrower defense on behalf of all persons listed on Exhibit 4, including Williams and Taveras. Doc. No. 47-1 at 6. The DTR explained that "Corinthian engaged in patterns and practices of unfair and deceptive conduct in violation of Massachusetts law, providing Everest MA students with defenses to repayment of their loans," citing the Secretary's borrower defense regulation to demonstrate that these state law violations made out defenses to repayment for the affected borrowers. Id. at 5. The DTR specifically requested that Education not require individual applications for loan discharge from each borrower. Id. at 6 n.5. In her only response to this letter, Education did not identify the absence of individual submissions as an impediment to relief. Doc. No. 93-1.

Further, Education has, in the past, allowed group discharges, contrary to the Secretary's argument that the borrower defense regulation does not allow group applications. In at least one other context, the Secretary has granted a group application for discharge filed by Attorney

General Healey without individual applications.[20] Although the Secretary attempts to distinguish that case because students there had signed individual acknowledgments that they had received misleading information, Doc. No. 81 at 18, the sufficiency of the evidence in each borrower defense application is not relevant to whether the borrower's submission properly invoked the Secretary's review process. Even if the 2017 group discharge involved factual circumstances that differ from those present in this case, such differences would bear only on the outcome of the Secretary's determination, and would not justify a failure to consider a discharge request.

In short, the Court finds that Attorney General Healey's DTR submission was sufficient to require the Secretary to determine the validity of the plaintiffs' borrower defense. It rejects the Secretary's assertion that Attorney General Healey needed a signed statement (or its equivalent) from each individual borrower before the DTR could invoke borrower defense proceedings on each identified student's behalf. Because the Secretary's decision to certify Williams and Taveras's debts for offset, despite the borrower defense presented to her by the DTR submission, "express[ed her] judgment as to what [she] consider[ed] to be a sufficiently developed issue . . . such consideration exhausts the issue." Mazariegos-Paiz, 734 F.3d at 63. Because the DTR submission put the Secretary on notice of Williams and Taveras's borrower defense, continued pursuit of available administrative remedies could not have further informed her decision. If any exhaustion requirement applied, it therefore was met by Attorney General Healey's DTR submission and the Secretary's subsequent decision to certify the plaintiffs' debts for offset notwithstanding the borrower defense the DTR submission had presented.

---

[20] See Press Release, U.S. Dep't of Educ., American Career Institute Borrowers to Receive Automatic Group Relief for Federal Student Loans (Jan. 13, 2017), https://www.ed.gov/news/press-releases/american-career-institute-borrowers-receive-automatic-group-relief-federal-student-loans (last visited Sept. 17, 2018) (cited in Doc. No. 57 at 3).

C.     The Administrative Record

Williams and Taveras moved to include Attorney General Healey's DTR submission in the administrative record to be reviewed in this action, Doc. No. 47 at 6–8, which the Secretary opposed, Doc. No. 50 at 8–10. The Secretary's primary argument for its exclusion from the administrative record was that the DTR submission was under seal and should not be disclosed publicly. Doc. No. 50 at 8–10. Since then, however, the Court has unsealed the DTR submission, Doc. No. 74, and the Secretary offers no other rationale for her failure to include the DTR submission in the administrative record. The DTR submission, which no party disputes was in the Secretary's possession at the time of her decision to certify Williams and Taveras's debts for collection by offset, referred to Williams and Taveras by name and sought the application of a borrower defense on their behalf, making it clearly relevant to the Secretary's decision. Its inclusion in the administrative record is therefore consistent with the principle that "[i]n a traditional APA case, 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" Boston Redevelopment Auth., 838 F.3d at 48 (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). The Court therefore allows the plaintiffs' motion to supplement the administrative record with Attorney General Healey's DTR submission.

D.     Education's Decision-Making Process

Under the APA, a court reviewing an agency decision shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency action

is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or

> reached a conclusion so implausible that it cannot be attributed to a difference of
> opinion or the application of agency expertise.

Associated Fisheries of Maine, Inc., 127 F.3d at 109. By contrast, a reasoned decision is one

"based on a consideration of the relevant factors." Marsh, 490 U.S. at 378. In evaluating an

agency decision, "the court may not substitute its judgment for that of agency officials but rather

must focus on whether the agency examined the relevant data and articulated a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made." Sistema Universitario Ana G. Mendez v. Riley, 234 F.3d 772, 777 (1st Cir. 2000)

(citation and alterations omitted).

Plainly, the Secretary did not consider Attorney General Healey's DTR submission in her

decision to certify the plaintiffs' debts, which counsel for the Secretary candidly conceded at the

January 26, 2018, hearing. Doc. No. 64 at 5. The Secretary defends her lack of consideration by

advancing several reasons that the DTR was not a borrower defense application on behalf of

Williams and Taveras and therefore was insufficient to stop certification of their debts. Doc. No.

81 at 8, 14–19.

The Secretary first argues that she was not required to consider Attorney General

Healey's DTR submission because Attorney General Healey could not have submitted a valid

borrower defense claim on behalf of the plaintiffs. Doc. No. 81 at 14–15. As described above,

the Court rejects this assertion because it has no basis in law.

The Secretary then argues that nothing in the DTR establishes that the plaintiffs relied

upon or were personally harmed by Corinthian's illegal conduct. Doc. No. 81 at 15. There are

several problems with this argument. Under the APA, the Court inquires into whether the agency

sufficiently reviewed the evidence before it, not whether such a review would necessarily result

in an outcome favorable to the plaintiffs. Had the DTR been insufficient to make out a successful

borrower defense claim, the Secretary would have been required to review and deny the claim. She could not, on that basis, have refused to review the claim. In any event, the Secretary's own regulations allow a borrower to assert a state law claim against the borrower's school as a borrower defense in a tax refund offset proceeding. 34 C.F.R. § 685.206(c)(1). Under Massachusetts law, detrimental reliance is not required to succeed on a claim under Chapter 93A. Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 492 (Mass. 2004) (finding "deceptive advertising . . . a per se injury on consumers"). Moreover, no language in the borrower defense regulation or any related regulation requires detrimental reliance in order for a borrower to state a claim sufficient for administrative consideration.[21]

The Secretary's notice to Williams and Taveras further undermines the argument that the DTR failed to seek review because it lacked evidence of detrimental reliance. Nowhere does the notice even mention that the borrower defense exists, let alone that the borrower must provide evidence of detrimental reliance to establish the defense.[22] In short, Education has cited no

---

[21] The Secretary points to 34 C.F.R. § 685.222(d)(1), which will require a borrower to establish reasonable reliance to the borrower's detriment to make out a borrower defense. Doc. No. 81 at 15 n.22. But that regulation was not in effect at the time relevant here and, in fact, may never take effect. See 83 Fed. Reg. 6,458 (Feb. 14, 2018) (explaining regulations have been delayed until July 1, 2019 "to ensure adequate time to . . . develop revised regulations"). Even if the regulation had been in effect at the relevant time, it applies, by its own terms, only to "loans first disbursed on or after July 1, 2017," 81 Fed. Reg. 75,926, 76,083 (Nov. 1, 2016), and consequently would not apply to Williams and Taveras's debts. At any rate, whether Attorney General Healey's DTR submission, which details many misrepresentations made by Everest in its advertising and recruitment, supports an inference that Taveras and/or Williams saw or were provided deceptive information about Everest and relied upon it to their detriment is a merits question. It goes to whether their defenses to repayment would have been successful, not whether the DTR invoked the defense process.

[22] The federal loan contracts Williams and Taveras signed stated, as to a borrower defense, "you [the borrower] can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for." A.R. at 7. The contracts did not state that a borrower must allege detrimental reliance to present a valid borrower defense. In any event, this would present a merits question, not a question about the Secretary's threshold duty to consider the borrower defense claim.

authority making a showing of detrimental reliance a prerequisite to obtaining review of a borrower defense claim.

The Secretary then argues that the DTR was not a borrower defense application on the plaintiffs' behalf because it did not provide certain information required for consideration. Doc. No. 81 at 16–17. Concededly, the Secretary's regulations require the submission of a debtor's Social Security number, 34 C.F.R. 30.24(b)(1), which the DTR did not include with respect to Williams and Taveras, Doc. No. 29-1 at 12. The Secretary appears to argue that she can reject consideration of a borrower defense application that fails to include Social Security numbers without providing any notice whatsoever that the Secretary ignored the application due to this omission and without providing any opportunity to cure. Doc. No. 81 at 17. Especially where, as here, the DTR contained ample identifying and contact information for the plaintiffs, and Education never identified the lack of certain information as a deficiency requiring cure, Education's failure to provide notice and an explanation of its decision is the very definition of arbitrary and capricious agency action. See State Farm, 463 U.S. at 48 ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner"); see also 5 U.S.C. § 555(e) ("Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding . . . accompanied by a brief statement of the grounds for denial"), Tesoro Alaska Petroleum Co. v. F.E.R.C., 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("Unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned.").[23]

_____

[23] In addition, although the DTR arrived after the 65-day window for objections, the Secretary received it before certifying the plaintiffs' debts, takes the position that she will consider late

Accordingly, the Court finds that the Secretary acted arbitrarily and capriciously by (1) ignoring or refusing to consider the DTR prior to certifying the plaintiffs' loans for tax refund offsets; (2) failing to determine whether Williams and Taveras, in light of the administrative record and the DTR, had established valid borrower defenses as defined in Education's regulations; and (3) failing to issue a reasoned decision on either of these points.

IV.    CONCLUSION

For the foregoing reasons, the Court determines that the DTR invoked a borrower defense proceeding on behalf of the people listed on Exhibit 4, including Williams and Taveras; that such a request was within Attorney General Healey's authority to make; that such a request was not precluded by federal regulations, even in the absence of an attachment of a personal request emanating from each individual borrower; and that certification, without consideration of Attorney General Healey's DTR submission, was arbitrary and capricious. "When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency." Seavey v. Barnhart, 276 F.3d 1, 12 (1st Cir. 2001) (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)). Accordingly, the Court hereby:

(1) ALLOWS in part and DENIES in part the plaintiffs' Motion for Judgment, Doc. No. 67, as described below;

(2) DENIES the Secretary's Motion for Judgment, Doc. No. 80;

(3) VACATES the certifications for offset as to Williams and Taveras;

---

filings, Doc. No. 87 at 3, and has not argued that the timing was a basis for disregarding the DTR. Therefore, she has waived a timeliness objection to the DTR.

(4) DECLARES that Attorney General Healey's letter, Doc. No. 47-1, required the Secretary to render a decision on the merits of Williams and Taveras's borrower defenses;

(5) REMANDS this matter to the Secretary for redetermination of her certification decision, including consideration of the borrower defense asserted by Attorney General Healey's letter, Doc. No. 47-1, on behalf of Williams and Taveras;[24]

(6) ORDERS the Secretary to report on the status and timing of her decision in 60 days; and

(7) RETAINS jurisdiction of this matter in the event of an appeal from or challenge to the administrative decision ordered by paragraph 5 and any subsequent decision regarding certification for offset as to Williams and Taveras.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[24] The Court "is not . . . empowered to conduct a de novo inquiry" into the Secretary's certification decision or the merits of Williams and Taveras's borrower defense, and accordingly does not "reach its own conclusions" about either. See Fla. Power & Light Co., 470 U.S. at 744.